1
2
3
4
5
6
7
8                    UNITED STATES DISTRICT COURT

9              FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   ROWAN BROOKS,                      No. 1:11-cv-01315-LJO-JLT (HC)

12              Petitioner,             **FINDINGS AND RECOMMENDATION**
                                        **TO DENY PETITION FOR WRIT OF**
13        v.                            **HABEAS CORPUS**

14   JAMES YATES,                       **[TWENTY-ONE DAY OBJECTION**
                                        **DEADLINE]**
15              Respondent.

16

17        Petitioner is currently serving a sentence of 25 years-to-life for his conviction of first

18   degree murder of his wife, Estella Fern Fox.  Petitioner brings this habeas petition claiming

19   violations of his constitutional rights.  As discussed below, the Court finds the claims to be

20   without merit and recommends the petition be **DENIED.**

21   **I.      PROCEDURAL HISTORY**

22        Petitioner was convicted in the Kern County Superior Court on April 4, 2006, of first

23   degree murder (Cal. Penal Code § 187).  (Doc. 54-8 at 1.[1])  On August 8, 2006, he was sentenced

24   to an indeterminate term of 25 years-to-life.  (Doc. 54-8 at 1.)

25        Petitioner appealed to the California Court of Appeal, Fifth Appellate District ("Fifth

26   DCA").  The Fifth DCA affirmed judgment on July 29, 2008, in a reasoned decision.  People v.

27

28   _____
     [1] All citations are to ECF pagination.

Brooks, 2008 WL 2897093 (Cal. Ct. App. 2008).  He then filed a petition for review in the California Supreme Court.  (Doc. 54-8 at 92.)  The petition was summarily denied without comment or citation to authority on November 12, 2008.  (Doc. 54-8 at 92.)

Petitioner filed a habeas petition in the Fifth DCA on July 24, 2008.  (Doc. 54-8 at 93.)  The petition was denied without prejudice to the petitioner first presenting the claim of ineffective assistance of counsel to the trial court; as to other issues, the court denied them for failing to present them on appeal, citing In re Walker, 10 Cal.3d 764, 773 (1974).  (Doc. 54-8 at 93.)

Petitioner next filed a habeas petition in the Kern County Superior Court on August 27, 2009.  (Doc. 54-8 at 4.)  The Kern County Superior Court denied the petition in a reasoned decision on October 30, 2009.  (Doc. 54-8 at 3-8.)  He submitted additional evidence to the court on January 11, 2010, and the court denied by addendum order on April 12, 2010.  (Doc. 54-8 at 2.)

On December 18, 2009, Petitioner filed a habeas petition in the Fifth DCA.  (Doc. 54-9 at 2.)  The petition was summarily denied without comment on June 17, 2010.  (Doc. 54-9 at 1.)  He then filed a habeas petition in the California Supreme Court on June 28, 2010, and the petition was summarily denied on August 11, 2010.  (Doc. 54-10 at 1-2.)

The original petition in this case was filed on August 9, 2011.  (Doc. 1.)  On November 28, 2016, upon being granted leave by the Court, Petitioner filed a First Amended Petition, on which this action now proceeds.  (Docs. 64, 65.)  Respondent filed an answer on February 9, 2017.  (Doc. 72).  Petitioner filed a traverse to Respondent's answer on April 8, 2017.  (Doc. 76.)

## II.    FACTUAL BACKGROUND

The Court adopts the Statement of Facts in the Fifth DCA's unpublished decision[2]:

Defendant married Fern on December 31, 1986. In the beginning they had a good marriage that included an intimate sexual relationship. Over the years, Fern experienced depression and their sexual intimacy ceased. Beginning in 2004, they slept in separate beds. Defendant was a social worker and Fern helped him in his office. Fern died on August 16, 2004.

---

[2] The Fifth DCA's summary of facts in its unpublished opinion is presumed correct.  28 U.S.C. §§ 2254(d)(2), (e)(1).  Therefore, the Court will rely on the Fifth DCA's summary of the facts.  Moses v. Payne, 555 F.3d 742, 746 (9th Cir. 2009).

2

Defendant's daughter from a prior marriage, Jinee Brooks, testified at trial. She is a registered nurse. Defendant was at a holiday party at Jinee's home in December of 2003. Fern was also there, but she was sitting in another room reading. Defendant asked Jinee and her nursing friends how they would kill someone if they were going to do it. Jinee said she would use potassium or succynicholine. Defendant asked why she chose those two chemicals and how one would obtain the chemicals. Jinee explained that she, as a nurse, could not obtain potassium. Defendant said that he could obtain it. Defendant then asked about giving nicotine to someone to kill them. Jinee explained that it would be difficult to kill someone with nicotine and the nicotine could be traced.

Debbie Coleman had known defendant for several years. She was a social worker for child protective services. She had met defendant when she was one of his clients in his counseling practice. Later she asked him to teach her cognitive therapy. They became friends and in March of 2004 began a sexual relationship. They had sex every day at his office or her apartment.

Defendant told Coleman he was going to ask Fern for a divorce. He showed Coleman the divorce papers he had typed up. Although defendant and Coleman had not discussed marriage prior to Fern's death, they had determined that after the divorce they would see where their relationship as a couple would lead. Defendant told Coleman he asked Fern for a divorce but she did not want a divorce. Coleman expressed to defendant her desire to spend more time together. Defendant and Coleman had sexual relations at his office on August 14, 2004.

Bobby Scrivner is Fern's daughter from a prior marriage. She testified that she was close to her mother. She had problems with Fern marrying defendant and she did not like him. She saw her mother frequently even though she did not want to associate with defendant. Over the course of time, she became more accepting of defendant because her mother was content.

On the evening of August 14, 2004, Fern and defendant went out to dinner with Bobby and her husband Stan to celebrate Stan's birthday. Fern was subdued at dinner and said she did not feel well. Fern normally finished her dinner but she was unable to do so on this evening. Conversation at the dinner table was forced, which was unusual. Fern and Bobby had previously discussed that defendant and Fern might go to Las Vegas for Christmas that year. During dinner Bobby asked Fern about the progress of the Las Vegas plans. Fern looked at defendant in a "funny" way and put her head down. She said she did not think they were going to be able to do that this year. Fern never told Bobby anything about a divorce. When they left the restaurant, Fern kissed Bobby and told her she loved her. Bobby was shocked because they did not usually openly express their affection toward one another. This was the last time Bobby saw her mother alive.

At approximately 3 a.m. on August 16, 2004, paramedics were called to defendant's home. Defendant opened the door and directed paramedic Adam Steele to the bedroom. Defendant said that Fern did not want cardio pulmonary resuscitation (CPR) performed; Steele asked defendant for the proper paperwork. Defendant was very calm and collected. Steele determined that no lifesaving procedures would be attempted because Fern was clearly dead.

Fire Captain Jeff McEntire testified that Fern had been dead at least a couple of hours. Defendant told McEntire that it had been several hours since he talked to Fern and he had been up watching the Olympics on television. Defendant continued to watch the Olympics, and offered coffee to the personnel in his home.

3

McEntire remembered this call quite well because of this and because defendant did not seem to be bothered by his wife's death.

Police officer Christopher Johnson was called to the scene to investigate the death. He asked defendant what had happened. Defendant told him he got up at 2:45 to use the restroom. He checked on Fern and found her dead in her bed, face down. Defendant told Johnson that Fern had been feeling ill the evening before but she was not suicidal. Johnson saw marks on the left side of Fern's neck but he did not think they were assaultive wounds. He asked defendant about the marks and defendant said that Fern had fallen several times. Defendant asked Johnson several times if the mortuary could come out and told Johnson that Fern wanted to be cremated. Defendant questioned why Johnson was taking pictures and why he had called the coroner's office. Defendant's demeanor was strange, but Johnson recognized that everyone reacts differently to these types of situations.

Fern's body was transported to the coroner's office and put into refrigeration. Defendant called Bobby at approximately 6 a.m. and told her Fern had died "apparently of a heart attack." Bobby went to defendant's, arriving at approximately 7:15 with her daughter and husband Stan. Bobby asked what had happened. Defendant said that Fern was having chest pains and not feeling well all day on August 15. He offered to take her to the emergency room but she would not go. She tried to get up and fell and hit the dresser. Defendant said that is why Fern had marks on her neck.

Defendant was not crying or emotional. Fern's will and living will were on the counter; Fern had executed do-not-resuscitate orders. Defendant remarked that he wondered if they would have to go to court. Defendant said he had a dental appointment and an appointment at the Social Security office. Bobby felt that defendant did not want her there. She left with her husband and daughter. Before leaving, Bobby told defendant she wanted to see her mother before she was cremated. Defendant said he would make the arrangements. Coleman called defendant before 8 a.m. He told Coleman that Fern had died and Bobby was currently at his apartment.

Defendant called the owner of the funeral home and arranged to meet him at the funeral home. Defendant met the owner at 8:30 a.m. Defendant kept his appointment for his routine teeth cleaning. He told the dental assistant that his wife had died that morning, yet his demeanor was ordinary.

Dr. Thomas Volk began the autopsy of Fern at approximately 1:25 p .m. on August 16, 2004. Dr. Volk had finished with Fern's external examination and began his internal examination by investigating her head. He noted injury to her head and stopped the autopsy. His assistant contacted her supervisor and the police department was called to participate in the autopsy.

After police personnel arrived, Dr. Volk continued the autopsy. Pictures and various samples were taken during the autopsy. Dr. Volk listed cardiac arrhythmia of minutes' duration due to aspiration of vomitus as the primary cause of death. He listed blunt force injuries at the hands of another as a contributing factor. Dr. Volk did not testify at trial.

In the late afternoon of August 16, 2004, after the autopsy was completed, defendant agreed to come to the police station for an interview. After the officers had asked defendant some questions, he was asked if he would agree to let them take scrapings from his fingernails. Defendant agreed to let them take scrapings.

4

When the officers left the room, defendant began methodically cleaning under each fingernail with his mouth. Defendant was not aware that there was a video camera in the room.

Coleman went to defendant's apartment the evening of August 16, 2004, unaware that he was at the police station. Officers were at the apartment conducting a search. An officer asked her what her relationship was with Coleman and she said they were just friends. She was interviewed at the police station on August 23, 2004, and at that time told the police that she had been having an affair with defendant.

After the interview, defendant was arrested but released the next morning. Coleman picked him up from jail. Defendant called Bobby on August 18, 2004, and said he needed to meet her and Stan at the bank. He said they needed to set matters up so that Bobby could take care of finances concerning Fern because he expected to be rearrested. Bobby had previously called the banks on August 17, 2004, after she learned of defendant's arrest and had them freeze all of Fern's bank accounts. Bobby told defendant that she thought freezing of accounts was a routine thing. Defendant was unable to remove any money from Fern's accounts at this time. Defendant gave Bobby some of Fern's personal belongings. Included in the box of belongings were journals written by Fern. The journals from 2003 and 2004 were not among the belongings.

Defendant and Coleman went out of town together on August 20, 2004. They went away together again the next weekend. They began living together in November of 2004 and were married on July 10, 2005. Defendant was not rearrested until August 25, 2005.

Defendant consulted an attorney in February of 2005 regarding Fern's estate. Also in February defendant went to the credit union and closed several accounts. He received $49,937.40.

During the search of defendant's apartment, officers removed a computer. On November 16, 2004, Detective Allan Abney conducted a forensic evidence search on the computer. He found evidence of several searches conducted on the computer that were of interest. The following searches were conducted: (1) "murder" (May 29, 2004), (2) "killing humans" (June 18, 2004), (3) "respiratory arrest" (July 2, 2004), (4) "Nicotine acid purchase" (July 9, 2004), (5) "chemicals that cause heart attacks" (July 23, 2004), (6) "causes of instant heart attack" (July 23, 2004), (7) "lethal dose levels" (July 25, 2004), and (8) "lethal doses of chemicals" (Aug. 14, 2004). In addition, defendant accessed a chapter from a textbook titled "Fast Poisoning." Detective Abney was not able to determine if the site results from the search were accessed, although on most of the searches more than one result page was viewed.

Dr. Glen Wagner, the chief medical examiner for San Diego County, was contacted by Detective Charles Church and asked to review the coroner's report, as well as the photographs, toxicology reports, and histological slides of tissues collected during the autopsy. Because Fern was cremated after the autopsy, Dr. Wagner was not able to examine her body.

Dr. Wagner began with the photographs showing the external injuries to Fern's body. He described bruising to Fern's left eye and discoloration below the left eye and on the left forehead. In addition, she had an area of discoloration over her right forehead. She had bruising of her lips, particularly the lower lip on the left side.

She had a bite mark to the front of her tongue and multiple and extensive injuries to her tongue in association with teeth as the objects causing the bruising. Fern had a series of bruises over her right shoulder and bruises and scrapes over her left shoulder. There was shadowing on the left jaw line, with additional bruising below the collarbone to the left upper chest. Fern had discoloration on her left hand and a laceration involving her thumb and three fingers. She had a large number of abrasions that had a curvilinear appearance over her left shoulder and neck, extending backward to the mid portion of her neck. The abrasions were patterned and appeared to be fingernail scrapes. She had some injuries to the right side of her neck and also had an ear bruise that extended towards her cheek.

Dr. Wagner then testified about internal injuries photographed during the autopsy. He said that one photograph showed gastric contents in the area of the voice box and larynx, but the amount was not extensive. Dr. Wagner saw discoloration on both sides of the airway, in the voice box and larynx. The hyoid bone, which sits directly above the larynx, was intact. This bone is very sensitive to any kind of pressure and is oftentimes fractured in cases of neck compression. Although Dr. Volk described no injuries to the hyoid and photographed no injuries in this area, Dr. Wagner saw injuries to the larynx in the photograph and interpreted them as having arisen from compression of this portion of the airway. Dr. Wagner saw bruising on the muscle of the scalp immediately above the right ear. There was bruising to the back right side of the brain, a common injury in falls.

Dr. Wagner testified that Fern's heart showed no gross evidence of disease, defect, or trauma and there was no evidence of a heart attack or heart injury. Dr. Volk found nothing wrong with the heart.

Dr. Wagner testified that Dr. Volk did a good job performing the autopsy, but Dr. Wagner's opinion differed from that of Dr. Volk. Dr. Wagner differed from Dr. Volk on the importance of vomitus in the airway. Dr. Wagner found the amount of vomit to be small. The vomit was not in the lungs, and it did not appear the vomit caused any blockage.

Dr. Wagner relied on hemorrhages in the brain and eye (petechiae in the eye). Dr. Wagner testified that petechiae anywhere, but particularly in the face and especially in the eyes, are a function of change in pressure. Petechiae are caused when pressure is put on the blood vessels and the capillaries (the very smallest vessels) rupture and cause pinpoint hemorrhages (petechiae). He testified "[i]n the case of an eye, and in the case of perivascular hemorrhages in the brain with evidence of trauma in the neck, there is a strong indication of an asphyxial component to this injury, whether it's a ligature or hanging or a choking of some fashion. But you have to cause a change in vascular pressures in order to cause those blood vessels to hemorrhage and break or bleed." These changes would not be caused by a heart attack. Dr. Wagner testified that the eye petechiae were not evident in the autopsy photographs but were present in Dr. Volk's microscopic slides and in Dr. Volk's report.

It was Dr. Wagner's opinion that the blunt force injuries were inconsistent with simple falls; the injuries were more consistent with a prolonged period of blunt force injuries. Based on the character, location, and pattern of the injuries, he found that they were more consistent with slaps, punches, and neck compression. He found the combination of bruises and abrasions on the left side of the neck and the contusions on the right side of the neck represented pressure being applied. It was, however, unusual that the hyoid bone was not fractured, but the thyroid cartilage right below the hyoid bone was fractured.

The semicurved injuries to the back of the neck and shoulders contained a number of semicircles that overlapped. The character of those injuries was most consistent with fingernail scratches. The overlapping injuries indicated the person causing the injuries was repositioning his or her hands. Some of the scratch marks were from the victim trying to get a hand away from the neck or head.

Dr Wagner believed that the primary cause of death was "asphyxiation because of the injuries to the neck, that the blunt-force injuries to the head and face, although in and of themselves not fatal, speak to an assault and, therefore, an injury at the hands of another; and that there is no underlying natural disease that I can find in the autopsy or the slides that would be an alternative description." The manner of death was a homicide.

## Defense

Several witnesses testified that they had never seen defendant act violently.

Defendant testified on his own behalf. He testified that he liked Fern but he wanted to be free from their marriage. He was having an affair with Debbie Coleman. He brought up the subject of divorce to Fern in August of 2004. She did not want a divorce and defendant agreed to wait, although he was not going to change his mind.

On August 15, 2004, defendant pulled out the divorce papers he had typed up. Fern suggested they share their living arrangements. Defendant said no. Fern was willing to go along with the divorce, although she was sad.

Fern had lost consciousness on several occasions prior to August 15, 2004. After Fern and defendant spoke about the divorce on August 15, 2004, Fern went into the kitchen to microwave some dinner. She called out to him, as she had collapsed on the floor in the kitchen. This was not unusual, except this time Fern was in pain. Defendant helped Fern to her feet, putting his hands under her armpits. He walked her into the bedroom. Fern did not want to go to the emergency room. Defendant got her a cold washcloth for her face and gave her a bucket because she felt sick.

Fern got in bed. Defendant watched the Olympics on television in the other room. He checked on her every 10 or 15 minutes and took her to the bathroom several times while she attempted to throw up.

At 11 p.m. Fern got up by herself; all of a sudden her legs collapsed. Defendant tried to grab her by the shoulders but his hands slipped off. Her head slipped towards the dresser and defendant's hands ended up around her neck. He grabbed her to keep her from hitting her head on the dresser. He got behind her and helped her up. She sat on the bed and then he helped her to the bathroom. She fell down again. She went to the bathroom and then back to bed. Defendant returned to watching the Olympics. He returned to the bedroom and the same thing happened again; this time he caught her around the mouth.

Defendant went to bed around midnight. He asked Fern if she wanted to go to the emergency room and she firmly told him no. Defendant got up about 3 a.m. to go to the bathroom. It looked like Fern was not breathing. He checked her and she was cold to the touch. He called 911.

He said he was not completely honest during his interview with police when he told them he did not know how Fern got injuries to her neck. He explained that he

was embarrassed that his hands had gotten around her neck. Defendant had no explanation for why he cleaned out his fingernails with his teeth at the police station.

Forensic pathologist Silvia Comparini studied the evidence from the autopsy. She interpreted the evidence much differently from Dr. Wagner. It was her opinion that Dr. Volk was correct that the cause of death was cardiac arrhythmia due to aspiration of vomitus. She would have added that Fern suffered moderate to severe fat in her right ventricle. The other injuries to Fern were consistent with having occurred from falls or being helped.

The court admitted portions of a tape made during a session between Fern and Hans King, a channeler, on August 14, 2004. During this session Fern and King discussed Fern and defendant's relationship. Fern said she still wanted the relationship. She said defendant told her he wanted a divorce. She said that their relationship had been nonsexual for years. She told King that a few weeks earlier defendant said he wanted to talk and said he wanted a divorce. She said it was a surprise because defendant was her best friend. She asked him if there was anything they could do about it or work on it, but he said he did not think so. Defendant told her he was very unhappy and he did not love her anymore. One evening, she asked defendant what if she said no to the divorce. He looked at her "funny" and did not answer. She said she wanted better reasons for why he wanted a divorce. Fern told King that her friendship relationship with defendant has always been perfect and beautiful. King advised Fern to tell defendant that she would like to know his reasons for a divorce and to say to him that she loves and honors him so much that she will give him a divorce if that is what he really wants. Fern told King that she asked defendant if they could share the house.

Brooks, 2008 WL 2897093, at *1–7.

## III.   DISCUSSION

A.   Jurisdiction

Relief by way of a petition for writ of habeas corpus extends to a person in custody pursuant to the judgment of a state court if the custody is in violation of the Constitution, laws, or treaties of the United States. 28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); Williams v. Taylor, 529 U.S. 362, 375 n. 7 (2000). Petitioner asserts that he suffered violations of his rights as guaranteed by the United States Constitution. The challenged conviction arises out of the Kern County Superior Court, which is located within the jurisdiction of this court. 28 U.S.C. § 2254(a); 28 U.S.C.§ 2241(d).

On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its enactment. Lindh v. Murphy, 521 U.S. 320 (1997) (holding the AEDPA only applicable to cases filed after statute's enactment). The instant petition was filed after the enactment of the AEDPA

and is therefore governed by its provisions.

   B.  <u>Legal Standard of Review</u>

   A petition for writ of habeas corpus under 28 U.S.C. § 2254(d) will not be granted unless the petitioner can show that the state court's adjudication of his claim: (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d); <u>Lockyer v. Andrade</u>, 538 U.S. 63, 70-71 (2003); <u>Williams</u>, 529 U.S. at 412-413.

   A state court decision is "contrary to" clearly established federal law "if it applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases, or "if it confronts a set of facts that is materially indistinguishable from a [Supreme Court] decision but reaches a different result."  <u>Brown v. Payton</u>, 544 U.S. 133, 141 (2005) (citing <u>Williams</u>, 529 U.S. at 405-406).

   In <u>Harrington v. Richter</u>, 562 U.S. 86, 101 (2011), the U.S. Supreme Court explained that an "unreasonable application" of federal law is an objective test that turns on "whether it is possible that fairminded jurists could disagree" that the state court decision meets the standards set forth in the AEDPA.  The Supreme Court has "said time and again that 'an unreasonable application of federal law is different from an incorrect application of federal law.'"  <u>Cullen v. Pinholster</u>, 563 U.S. 170, 203 (2011).  Thus, a state prisoner seeking a writ of habeas corpus from a federal court "must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility of fairminded disagreement."  <u>Harrington</u>, 562 U.S. at 103.

   The second prong pertains to state court decisions based on factual findings.  <u>Davis v. Woodford</u>, 384 F.3d 628, 637 (9th Cir. 2003) (citing <u>Miller-El v. Cockrell</u>, 537 U.S. 322 (2003)).  Under § 2254(d)(2), a federal court may grant habeas relief if a state court's adjudication of the petitioner's claims "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  <u>Wiggins v. Smith</u>, 539

U.S. 510, 520 (2003); Jeffries v. Wood, 114 F.3d 1484, 1500 (9th Cir. 1997). A state court's factual finding is unreasonable when it is "so clearly incorrect that it would not be debatable among reasonable jurists." Jeffries, 114 F.3d at 1500; see Taylor v. Maddox, 366 F.3d 992, 999-1001 (9th Cir. 2004), *cert.denied*, Maddox v. Taylor, 543 U.S. 1038 (2004).

To determine whether habeas relief is available under § 2254(d), the federal court looks to the last reasoned state court decision as the basis of the state court's decision. See Ylst v. Nunnemaker, 501 U.S. 979, 803 (1991); Robinson v. Ignacio, 360 F.3d 1044, 1055 (9th Cir. 2004). "[A]lthough we independently review the record, we still defer to the state court's ultimate decisions." Pirtle v. Morgan, 313 F.3d 1160, 1167 (9th Cir. 2002).

The prejudicial impact of any constitutional error is assessed by asking whether the error had "a substantial and injurious effect or influence in determining the jury's verdict." Brecht v. Abrahamson, 507 U.S. 619, 623 (1993); see also Fry v. Pliler, 551 U.S. 112, 119-120 (2007) (holding that the Brecht standard applies whether or not the state court recognized the error and reviewed it for harmlessness).

C.     Review of Claims

The instant petition presents the following grounds for relief: 1) The conviction was obtained by false evidence, and the prosecution allowed the false evidence to be introduced; 2) There was insufficient evidence of premeditation and deliberation; 3) The prosecutor committed misconduct by improperly conducting voir dire, making improper arguments, violating in limine orders, conducting improper cross-examination, falsely accusing the petitioner of a crime, and suppressing exculpatory evidence; 4) Defense counsel rendered ineffective assistance by inadequately arguing for admission of Dr. Volk's autopsy report, failing to object to multiple misstatements of facts and evidence by the prosecution, and failing to present available medical evidence on the decedent's health concerning her alleged heart problem; 5) Appellate counsel rendered ineffective assistance by failing to raise certain issues; and 6) The trial court was biased against Petitioner and committed numerous errors. (Doc. 64 at 5-34.) The Court notes that Petitioner also raises a claim of actual innocence (Doc. 64 at 5), but the issue was rejected by the Court and subsequently by the Ninth Circuit. (Docs. 31, 43.)

1. <u>False Evidence</u>

Petitioner first claims that his conviction was obtained by false evidence. This claim was raised on direct appeal in the state courts. In the last reasoned decision, the Fifth DCA denied the claim as follows:

> Again in laundry-list fashion defendant cites a plethora of areas in the transcript where he claims the prosecutor committed deliberate misconduct by the use of deceptive or reprehensible methods.
>
> "A defendant's conviction will not be reversed for prosecutorial misconduct, however, unless it is reasonably probably that a result more favorable to the defendant would have been reached without the misconduct. [Citation.] Also, a claim of prosecutorial misconduct is not preserved for appeal if defendant fails to object and seek an admonition if an objection and jury admonition would have cured the injury. [Citation.]" (*People v. Crew* (2003) 31 Cal.4th 822, 839.)
>
> "'Under well-established principles of due process, the prosecution cannot present evidence it knows is false and must correct any falsity of which it is aware in the evidence it presents....' [Citation.]" (*People v. Harrison* (2005) 35 Cal.4th 208, 242.) It is also misconduct "for a prosecutor to violate a court ruling by eliciting or attempting to elicit inadmissible evidence in violation of a court order." (*People v. Crew, supra*, 31 Cal.4th at p. 839.)
>
> Defendant contends the prosecutor permitted Dr. Wagner, the pathologist, to misrepresent the contents of Dr. Volk's report and misrepresent evidence regarding the microscopic slides, and also argued the misrepresented evidence in his closing argument. In particular, defendant claims Dr. Wagner misrepresented Dr. Volk's report when he testified that Volk had noted seeing petechiae in the eyes. In addition, defendant claims there was no microscopic slide of the eye; thus Dr. Wagner could not have viewed the slide and seen petechiae. He asserts that Dr. Wagner misrepresented an injury to Fern's brain that was not described in the report. Defendant contends that Dr. Wagner's testimony on these points was simply wrong and the prosecution did nothing to correct the error.
>
> Although defendant claims to have objected to some of this testimony at trial, he has not shown where he objected and/or that the objection was one of prosecutorial misconduct. His failure to pinpoint his objections here, and/or to have made the objections on the ground now asserted at trial waives the issue. In addition, we note that Dr. Wagner is an expert and is allowed to independently interpret the autopsy report and microscopic slides. It was not established at trial that there was no slide made of the eye. The autopsy report is very general under "microscopic evaluation." Also, on cross-examination of Dr. Wagner and on examination of the defense expert, there was a great deal of questioning and testimony surrounding the presence and/or location of petechiae. As our previous discussion regarding petechiae demonstrates, the notation in Dr. Volk's report regarding petechiae in the area of the eye could only be interpreted by an expert. We cannot say that the People misrepresented the report or that the report demonstrates that there was no microscopic slide of the eye reviewed by Dr. Wagner.
>
> Dr. Wagner testified that in exhibit 14, a picture of the brain, he saw a bruise to the back right side of the brain and such an injury is common in falls. Dr. Wagner, as an expert, was able to interpret the photographs as he saw fit. That he saw

> something different from Dr. Volk does not make any representation by the People adopting Dr. Wagner's conclusion a misrepresentation, and certainly not an intentional misrepresentation. On one occasion, the People and the defense expert engaged in a disagreement regarding another hemorrhage, with the People calling it on the brain and the expert saying it was not on the brain. The People conceded inappropriately using the word "brain" during questioning while Dr. Volk did not use the term "on the brain."
>
> Defendant has not shown that proper objections were made, or that if an objection had been made that an admonition would not have cleared up the problem. Defendant has also not shown that the prosecution presented evidence it knew was false.

Brooks, 2008 WL 2897093, at *35–36.

Petitioner raised the claim again on state habeas. The Kern County Superior Court rejected the claim noting that "[t]he appellate court found no use of false testimony by the People to warrant reversal" and that "Petitioner points to no other witnesses who recanted their testimony claiming fabrication." (Doc. 54-8 at 6.) The court, citing In re Waltreus, 62 Cal.2d 218, 225 (1965), implicitly found that any new evidence presented did not affect the Fifth DCA's resolution of the claim. See In re Robbins, 18 Cal.4th 770, 814 n.34 (1998) ("When a petitioner attempts to avoid the bars of . . . *Waltreus, supra*, 62 Cal.2d 218, by relying upon an exhibit (in the form of a declaration or other information) from outside the appellate record, we nevertheless apply the bar if the exhibit contains nothing of substance not already in the appellate record"). Petitioner raised the claim in a second habeas petition to the Kern County Superior Court, and the state court denied it by referring to its previous ruling and its "factual and legal analysis." (Doc. 71-14 at 2.)

a. Legal Standard

"[A] conviction obtained by the knowing use of perjured testimony is fundamentally unfair, and must be set aside if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." United States v. Agurs, 427 U.S. 97, 103 (1976); Napue v. Illinois, 360 U.S. 264 (1959). So must a conviction obtained by the presentation of false evidence. See United States v. Bagley, 473 U.S. 667, 678-80 nn.8-9 (1985). In Napue, the Supreme Court held that the knowing use of false testimony to obtain a conviction violates due process regardless of whether the prosecutor solicited the false testimony or merely allowed it to

12

go uncorrected when it appeared.  Id. at 269.  The Court explained that the principle that a State may not knowingly use false testimony to obtain a conviction - even false testimony that goes only to the credibility of the witness - is "implicit in any concept of ordered liberty."  Id.  In order to prevail on such a due process claim, "the petitioner must show that (1) the testimony (or evidence) was actually false, (2) the prosecution knew or should have known that the testimony was actually false, and (3) the false testimony was material."  United States v. Zuno–Arce, 339 F.3d 886, 889 (9th Cir. 2003), cert. denied, 540 U.S. 1208 (2004).  Nevertheless, simple inconsistencies in testimony are insufficient to establish that a prosecutor knowingly permitted the admission of false testimony.  United States v. Zuno-Arce, 44 F.3d 1420, 1423 (9th Cir.1995).  "Discrepancies in . . . testimony . . . could as easily flow from errors in recollection as from lies."  Id.

b.  Analysis

Dr. Wagner testified that he viewed microscopic slides taken from the victim's body by Dr. Volk.  Specifically, Dr. Wagner stated that from "[Dr. Volk's] slides and his report," he located "hemorrhages in the [victim's] eye."  (Doc. 54-2 at 130.)

In actuality, Dr. Volk's report noted petechiae in an area near the eye and on the face, but the report did not mention petechiae in the eye itself.  In addition, Dr. Volk did not create slides from the victim's eye.  Based on this, Petitioner contends Dr. Wagner provided false evidence, and the prosecutor knowingly elicited false evidence when Dr. Wagner so testified.  Petitioner further argues this false evidence was significant because the foundation for Dr. Wagner's conclusion that the victim died as a result of homicide was his viewing petechiae in the victim's eye.

Based on Dr. Volk's declaration that he had not made microscopic slides of the eyes, and that he had not noted petechiae in the eyes but near the eyes, Petitioner made a prima facie showing that Dr. Wagner erred when he stated that he had viewed Dr. Volk's microscopic slides and report from which he located petechiae in the eyes.  However, he has not shown that Dr. Wagner knowingly relied on false evidence thereby arriving at an erroneous conclusion.  At most, Petitioner has shown that Dr. Wagner mistakenly interpreted Dr. Volk's report and attributed the

13

creation of the slides to Dr. Volk. Moreover, there is no evidence that the prosecution knowingly elicited false testimony from Dr. Wagner. As noted by Respondent, attorneys may properly rely on the opinions provided by expert witnesses. Stokley v. Ryan, 659 F.3d 802, 813 n.8 (9th Cir. 2011); Sims v. Brown, 425 F.3d 560, 585–86 (9th Cir. 2005). Absent some proof that the prosecution knew or must have known Dr. Wagner was testifying falsely, Petitioner's claim against the prosecution must fail.

Moreover, Petitioner has not shown that Dr. Wagner relied on false evidence in arriving at his conclusions. On cross-examination, Dr. Wagner was questioned concerning his viewing of certain items that Dr. Volk did not note in his autopsy. (Doc. 54-2 at 149.) Defense counsel asked him whether he had seen petechiae in the eyes in the photographs. (Doc. 54-2 at 171.) Dr. Wagner responded that he was not certain whether he read or it saw it, and he was not certain if there were photographs of the eye. (Doc. 54-2 at 171.) Significantly, when Dr. Wagner was questioned again concerning the slides, he stated that he had received "12 *recut* histological slides" of tissue. (Doc. 54-2 at 150, 186 (emphasis added).) He thus made clear that he did not view the original slides created by Dr. Volk, but rather "recuts" of tissue that were made later, and he assumed that these recuts used at trial were "pretty close to" or "similar to" whatever "slides [Dr. Volk] has." (Doc. 54-2 at 186.) Thus, the error Dr. Wagner initially made regarding the source of the slides was cured since it was now clear that Dr. Volk was not the author of those slides. Dr. Dollinger had conducted a second autopsy after Dr. Volk; obviously, he could have been the source of these recuts. (Doc. 54-6 at 213-14.) Because of this, the state court could reasonably have determined that Petitioner failed to make a prima facie showing that the prosecution relied on false testimony.

In addition, Dr. Wagner did not rely only on petechiae in the victim's eye in arriving at his conclusions. His determination was also based on perivascular hemorrhaging, i.e., "bleeding around the blood vessels," in the brain, and cerebral edema. (Doc. 54-2 at 128, 136.) Dr. Wagner stated that both of these conditions indicated an increase in pressure in blood vessels and a deprivation of oxygenation for some period of time, which could not have been caused by a heart attack as Dr. Volk concluded. (Doc. No. 54-2 at 128, 136.) He further stated that "[p]etechia

14

anywhere, but particularly in the face and especially the eyes, are a function of change in pressure." (Doc. 54-2 at 129.) Where petechiae are found in conjunction with perivascular hemorrhages in the brain and trauma in the neck, there is a strong indication of asphyxiation. (Doc. 54-2 at 129.) There was evidence in the record of petechiae in the eyes from Dr. Wagner's examination, and petechiae near the victim's eye and in the victim's face from Dr. Volk's autopsy. (Doc. 16 at 51; Doc. 54-2 at 129-30.)

He also relied on evidence of "areas of discoloration" in the trachea. (Doc. 54-2 at 124.) Significantly, Dr. Wagner noted that Dr. Volk did not describe any lesions in the trachea, but Dr. Wagner interpreted the discoloration "as partial fractures of the larynx" which would indicate trauma to the neck. (Doc. 54-2 at 124.) In addition, Dr. Wagner noted that the injuries evident in the trachea corresponded to the external bruising located on the victim's neck, which further added credibility to the findings of trauma to the trachea. (Doc. 54-2 at 198-199.)

Further, Dr. Wagner noted evidence of multiple injuries to the head and shoulders which, while not fatal, were a contributing factor. (Doc. 54-2 at 125.) He noted areas of discoloration on the forehead which he characterized as injuries but were not noted as such by Dr. Volk. (Doc. 54-2 at 181-82.) He noted that blunt-force injuries to the right side of the forehead, around the right ear, around the left eye, about the mouth, and about the neck and shoulders are inconsistent with accidental falls, but significantly, pointed to a third party inflicting damage. (Doc. 54-2 at 131-33.) This conclusion was further substantiated by the series of semi-circular point contusions to the neck and shoulders that would indicate someone attempting to asphyxiate the victim. (Doc. 54-2 at 132-33.) Dr. Wagner concluded that "the primary cause of death [wa]s asphyxiation because of the injuries to the neck, that the blunt-force injuries to the head and face, although in and of themselves not fatal, speak to an assault and, therefore, an injury at the hands of another." (Doc. 54-2 at 137-38.)

Ultimately, Dr. Wagner concluded that "the manner of death must be homicide." (Doc. 54-2 at 142.) He reached this conclusion based on the significant trauma to the victim by blunt-force injuries and the evidence of asphyxia, which in combination could not have been caused by a fall or something the victim did to herself, but must have been by the hands of another. (Doc.

54-2 at 143-44.)  Further, Dr. Wagner found that "it would be a homicide even if there was evidence of a heart attack or respiratory failure from other causes."  (Doc. 54-2 at 144.)

Petitioner fails to show that Dr. Wagner's conclusions were based on false evidence or that the prosecution knowingly relied on false testimony.  Dr. Wagner's opinions were simply different from Dr. Volk's and were matters left to be resolved by the jury.  United States v. Geston, 299 F.3d 1130, 1135 (9th Cir. 2002) (stating two conflicting versions of evidence presented to jury are within province of jury to decide).

Furthermore, there was no prejudice.  This was not a case where Dr. Wagner and Dr. Volk both viewed microscopic slides of the eye, and Dr. Wagner testified that he and Dr. Volk were in agreement that the slides showed petechiae, while in truth Dr. Volk did not report seeing petechiae.  Rather, according to his statement, Dr. Volk did not create any microscopic slides of eye tissue and did not view any slides of the eye.  (Doc. 64 at 59-60.)  Based on his recollection, Dr. Volk did not recall observing any petechiae in the victim's eyes.  (Doc. 64 at 59-60.)  Had the jury been so informed, there is no reasonable probability that the outcome would have been different.  Dr. Volk stated he never viewed any slides of the victim's eyes, so his statement that he had not viewed petechiae in the eye slides would have been of no consequence.  Dr. Wagner testified to what he saw in the eye slides.  His initial mistake in crediting Dr. Volk for the creation of the slides was harmless beyond a reasonable doubt.

In addition, there was overwhelming evidence of Petitioner's guilt apart from the medical evidence.  Prior to the homicide, Petitioner had repeatedly conducted internet searches for ways to kill without detection.  He searched such subjects as "lethal doses of chemicals," "fast poisoning," "lethal dose levels," "causes of instant heart attacks," "chemicals that cause heart attacks," "nicotine acid purchase," "respiratory arrest," "killing humans," and "murder."  (Doc. 54-3 at 212-220.)  At a party, Petitioner had come up to his medical professional daughter and her medical professional friends and asked them, "Hey, if you were going to kill somebody, how would you do it?"  (Doc. 54-4 at 42.)  The daughter responded that she would inject either potassium or Succynicholine.  (Doc. 54-4 at 42-43.)  Petitioner asked why she chose those two chemicals and she explained how the chemicals would cause death.  (Doc. 54-4 at 44.)  Petitioner

then asked how she would obtain these chemicals.  (Doc. 54-4 at 44.)  The daughter explained that she couldn't obtain it, and Petitioner responded that he could.  (Doc. 54-4 at 45.)  The daughter stated that she couldn't understand how he could obtain it if she as a medical professional could not, but Petitioner stated, "No, I could get it."  (Doc. 54-4 at 45.)  Petitioner then inquired about other chemicals to use for killing, such as nicotine.  (Doc. 54-4 at 46.)

Petitioner also admitted lying to the police investigators.  (Doc. 54-5 at 214.)  During the 9-1-1 call, Petitioner advised that he had not seen the victim since earlier the prior evening.  (Doc. 54-5 at 150.)  At trial, he admitted he had been with the victim all evening rendering her aid until she went to sleep around midnight.  (Doc. 54-5 at 150-151.)  He had told investigators that the victim had fallen and impacted the dresser in the bedroom, but on cross-examination he admitted that was a lie.  (Doc. 54-5 at 212-14.)  He also testified that he was at his residence from noon to 4:00 p.m. the prior day discussing divorce with the victim.  (Doc. 54-5 at 154.)  He stated that the entire four hours, without a break, were consumed with discussions about divorce and the property that needed to be distributed.  (Doc. 54-5 at 158.)  Later, when confronted with cellphone records of calls made by him between 1:30 and 3:15 p.m., including one to the victim, he admitted he had left the residence during that time.  (Doc. 54-5 at 159-62, 208-11.)  And when confronted with statements he made to investigators that contradicted his trial testimony, he admitted to lying to the investigators on numerous occasions.  (Doc. 54-5 at 196-207.)

Petitioner also demonstrated a consciousness of guilt when he explained to the victim's daughter the manner in which she had died.  Petitioner stated that the victim had fallen and hit the dresser, which at trial he stated was a lie.  (Doc. 54-3 at 46; Doc. 54-5 at 212-14.)  He then told her that this was the reason she has marks on her neck, but demonstrated with his hand that she had been choked.  (Doc. 54-3 at 46-47, 93-94.)

Also damaging was when investigators asked if they could take fingernail scrapings of Petitioner as evidence and then left the room, Petitioner was surreptitiously videotaped methodically cleaning under each fingernail with his teeth.  (Doc. 54-5 at 214-15; Doc. 54-4 at 154; Doc. 71-11 at 2.)

For the foregoing reasons, a rational factfinder could determine that Dr. Wagner did not

provide false testimony, or that the prosecution knowingly allowed false evidence to be submitted to the jury. Further, in light of the overwhelming nonmedical evidence against Petitioner, any error in Dr. Wagner attributing the creation and viewing of microscopic slides of the eye to Dr. Volk was harmless beyond a reasonable doubt. The claim should be denied.

## 2. Insufficient Evidence

Petitioner next argues that the evidence was insufficient to support the finding of premeditation and deliberation. This claim was raised on appeal. In the last reasoned decision, the Fifth DCA rejected the claim as follows:

> Defendant argues the evidence is insufficient to support a finding of premeditation and deliberation. In particular, he contends the manner of the killing suggests an impulsive killing. He asserts there was no evidence of planning activity, dismissing the internet searches and party talk as an academic interest and having no relationship to the way Fern was killed. He claims the evidence of motive was weak because, although he was unhappy in his marriage, he expressed his wish for a divorce to Fern and would not have done so if he were going to kill her to avoid paying alimony.
>
> "In addressing a challenge to the sufficiency of the evidence supporting a conviction, the reviewing court must examine the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidence—evidence that is reasonable, credible and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citation.] The appellate court presumes in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence. [Citations.] The same standard applies when the conviction rests primarily on circumstantial evidence. [Citation.] Although it is the jury's duty to acquit a defendant if it finds the circumstantial evidence susceptible of two reasonable interpretations, one of which suggests guilt and the other innocence, it is the jury, not the appellate court that must be convinced of the defendant's guilt beyond a reasonable doubt. [Citation.] '"If the circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court that the circumstances might also reasonably be reconciled with a contrary finding does not warrant a reversal of the judgment."'" (*People v. Kraft* (2000) 23 Cal.4th 978, 1053–1054.)
>
> "In making our determination, we focus on the whole record, not isolated bits of evidence. [Citation.] We do not reweigh the evidence; the credibility of witnesses and the weight to be accorded to the evidence are matters exclusively within the province of the trier of fact. [Citation.] We will not reverse unless it clearly appears that on no hypothesis whatever is there sufficient substantial evidence to support the jury's verdict. [Citations.]" (*People v. Upsher* (2007) 155 Cal.App.4th 1311, 1321–1322.)
>
> Defendant's argument focuses on the framework set forth in *People v. Anderson* (1968) 70 Cal.2d 15 for evaluating whether there is substantial evidence to sustain findings of premeditation and deliberation. In *Anderson*, the California Supreme Court "described three categories of evidence recurring in those cases: planning, motive, and manner of killing. [Citations.] The *Anderson* decision stated:

18

'Analysis of the cases will show that this court sustains verdicts of first degree murder typically when there is evidence of all three types and otherwise requires at least extremely strong evidence of [planning] or evidence of [motive] in conjunction with [evidence of] either [planning] or [manner of killing].' [Citations.] Since *Anderson*, we have emphasized that its guidelines are descriptive and neither normative nor exhaustive, and that reviewing courts need not accord them any particular weight. [Citations.]" (*People v. Halvorsen* (2007) 42 Cal.4th 379, 419–420, brackets in original except those indicating citations.)

The evidence here supports the jury's verdict of first degree murder. For several months, defendant had been researching methods to kill, as evidenced by the computer searches and his discussion with his daughter about killing someone. This was clear evidence of planning. Fern was strangled. Strangling someone takes a significant period of time and is an exacting method of causing death. In addition, the manner in which defendant killed her, leaving fewer traces than usual for a strangling, suggests he utilized methods that aided in covering up the strangling. Defendant had a motive to kill Fern. He was having an affair with Debbie Coleman and he wanted a divorce from Fern. Fern did not want a divorce. In addition, although Fern did not have abundant assets, she did have some assets. Also, Fern's only income was a meager check from Social Security. Defendant was the main breadwinner. If he divorced Fern, he would most likely have had to pay spousal support. We note that there was no evidence of a struggle in the apartment where Fern died, thus suggesting that the two were not engaged in a fight that led to the killing. All of the above is sufficient to find that defendant made a calculated judgment to kill Fern and to support his conviction for first degree murder.

Brooks, 2008 WL 2897093, at *7–8.

a. Legal Standard

The law on sufficiency of the evidence is clearly established by the United States Supreme Court. Pursuant to the United States Supreme Court's holding in Jackson v. Virginia, 443 U.S. 307 (1979), the test on habeas review to determine whether a factual finding is fairly supported by the record is as follows: "[W]hether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson, 443 U.S. at 319; see also Lewis v. Jeffers, 497 U.S. 764, 781 (1990). Thus, only if "no rational trier of fact" could have found proof of guilt beyond a reasonable doubt will petitioner be entitled to habeas relief. Jackson, 443 U.S. at 324. Sufficiency claims are judged by the elements defined by state law. Id. at 324, n. 16.

If confronted by a record that supports conflicting inferences, a federal habeas court "must presume–even if it does not affirmatively appear in the record–that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution." Id. at 326. Circumstantial evidence and inferences drawn from that evidence may be sufficient to sustain a

conviction.  <u>Walters v. Maass</u>, 45 F.3d 1355, 1358 (9th Cir. 1995).

After the enactment of the AEDPA, a federal habeas court must apply the standards of <u>Jackson</u> with an additional layer of deference.  <u>Juan H. v. Allen</u>, 408 F.3d 1262, 1274 (9th Cir. 2005).  In applying the AEDPA's deferential standard of review, this Court must presume the correctness of the state court's factual findings.  28 U.S.C. § 2254(e)(1); <u>Kuhlmann v. Wilson</u>, 477 U.S. 436, 459 (1986).

In <u>Cavazos v. Smith</u>, 565 U.S. 1 (2011), the United States Supreme Court further explained the highly deferential standard of review in habeas proceedings, by noting that <u>Jackson</u>

> makes clear that it is the responsibility of the jury - not the court - to decide what conclusions should be drawn from evidence admitted at trial. A reviewing court may set aside the jury's verdict on the ground of insufficient evidence only if no rational trier of fact could have agreed with the jury. What is more, a federal court may not overturn a state court decision rejecting a sufficiency of the evidence challenge simply because the federal court disagrees with the state court. The federal court instead may do so only if the state court decision was "objectively unreasonable."

> Because rational people can sometimes disagree, the inevitable consequence of this settled law is that judges will sometimes encounter convictions that they believe to be mistaken, but that they must nonetheless uphold.

<u>Id</u>. at 3-4.

b.  <u>Analysis</u>

In this case, the state court applied the <u>Jackson</u> standard; therefore, the only question is whether the state court's application was objectively unreasonable.  <u>Id</u>.

There was substantial evidence from which a jury could find the elements of premeditation and deliberation.  Petitioner's internet searches for methods of killing as well as his inquiries with his medical professional daughter and friends were clear evidence of planning. There was also a motive to kill the victim.  Petitioner wanted a divorce and the victim did not. The victim had few assets and Petitioner was the main source of income for the couple.  In the event of divorce, Petitioner would have had to pay spousal support.  There was no evidence of struggle and the victim was killed by strangulation.  This suggests the killing was deliberate and not the result of a fight.  From all of the above, a reasonable factfinder could have determined that there was sufficient evidence of premeditation and deliberation.  The claim should be rejected.

3.     Prosecutorial Misconduct

Petitioner next contends that the prosecutor committed misconduct by improperly conducting voir dire, making improper arguments, violating in limine orders, conducting improper cross-examination, falsely accusing the petitioner of a crime, and suppressing exculpatory evidence.

This claim was also raised and rejected by the Fifth DCA on direct review, as follows:

> Again in laundry-list fashion defendant cites a plethora of areas in the transcript where he claims the prosecutor committed deliberate misconduct by the use of deceptive or reprehensible methods.
>
> ….
>
> Next, defendant argues the prosecution asked questions so obviously improper that they could not have been asked in good faith and cites a long list of such "obviously improper tactics." As examples, defendant cites to the People asking prospective jurors, during jury selection, if anyone had cheated on a spouse (a defense objection was immediately sustained), asking prospective jurors if they think a person that cheats on a spouse is an honest person (claimed improper attempts to get the jury to prejudge the case), asking sarcastic questions to Coleman (the court told the prosecutor to change her attitude), asking questions that were insulting to Dr. Comparini, and asking questions about the defendant's demeanor after Fern's death (claimed as eliciting evidence in violation of an in limine ruling). In none of these instances has defendant shown that an objection based on prosecutorial misconduct was made. He has waived any claim of error.
>
> Finally defendant contends the prosecutor repeatedly misstated facts and referred to facts not in evidence in her closing argument. Again, defendant has failed to show where he objected based on prosecutorial misconduct to the argument of the prosecutor. In addition, "[a]ssuming (which we do not) that the prosecutor's argument was improper, it clearly appears, from a review of the entire record, that the argument was harmless, and that no prejudice was (or can be) demonstrated." (*People v. Adanandus* (2007) 157 Cal.App.4th 496, 514.)
>
> Additionally, the jury was instructed that statements made by the attorneys during trial are not evidence, thus reducing the chance that the jury relied on any improper statement of facts by the prosecution. (*People v. Boyette* (2002) 29 Cal.4th 381, 453.) Also, the jury was informed that it must determine the facts from the evidence received at trial and not from any other source.
>
> Defendant has failed to demonstrate that any prosecutorial misconduct that occurred was prejudicial. Defendant has forfeited the right to raise any prosecutorial misconduct that he did not object to. Even if the prosecutor engaged in misconduct, a review of the entire record demonstrates the trial was not so fundamentally unfair so as to trigger the *Chapman* (*Chapman v. California* (1967) 386 U.S. 18.) standard of prejudicial error. (*People v. Adanandus, supra*, 157 Cal.4th at p. 515.)

Brooks, 2008 WL 2897093, at *35–36.

1          a.   Procedural Default

2              As an initial matter, the Court notes that the state court determined that many of

3      Petitioner's allegations of prosecutorial misconduct were procedurally barred because no

4      contemporaneous objection was made at trial.

5              A federal court will not review a claim of federal constitutional error raised by a state

6      habeas petitioner if the state court determination of the same issue "rests on a state law ground

7      that is independent of the federal question and adequate to support the judgment." Coleman v.

8      Thompson, 501 U.S. 722, 729 (1991).  This rule also applies when the state court's determination

9      is based on the petitioner's failure to comply with procedural requirements, so long as the

10     procedural rule is an adequate and independent basis for the denial of relief.  Id. at 730.  For the

11     bar to be "adequate," it must be "clear, consistently applied, and well-established at the time of

12     the [ ] purported default." Fields v. Calderon, 125 F.3d 757, 762 (9th Cir. 1997).  For the bar to

13     be "independent," it must not be "interwoven with the federal law." Michigan v. Long, 463 U.S.

14     1032, 1040-41 (1983).  If an issue is procedurally defaulted, a federal court may not consider it

15     unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the

16     alleged violation of federal law, or demonstrate that failure to consider the claims will result in a

17     fundamental miscarriage of justice.  Coleman, 501 U.S. at 749-50.

18             In Melendez v. Pliler, 288 F.3d 1120, 1125 (9th Cir. 2002), the Ninth Circuit held that

19     California's contemporaneous objection doctrine is clear, well-established, and has been

20     consistently applied when a party has failed to make any objection to the admission of evidence.

21     In Vansickel v. White, 166 F.3d 953 (9th Cir. 1999), the Ninth Circuit held that the

22     contemporaneous objection bar is an adequate and independent state procedural rule.  In this case,

23     Petitioner did not object to the prosecutor's voir dire questions, her alleged improprieties in

24     questioning witnesses, her questions concerning Petitioner's demeanor after the victim's death,

25     and her alleged misstatement of facts and reference to facts not in evidence during closing

26     argument.  Further, Petitioner has not demonstrated cause for the default or actual prejudice

27     resulting therefrom.  Thus, these claims are procedurally defaulted and should be dismissed.

28     ///

b. <u>Legal Standard</u>

A petitioner is entitled to habeas corpus relief if the prosecutor's misconduct "so infected the trial with unfairness as to make the resulting conviction a denial of due process." <u>Donnelly v. DeChristoforo</u>, 416 U.S. 637, 643 (1974). To constitute a due process violation, the prosecutorial misconduct must be "of sufficient significance to result in the denial of the defendant's right to a fair trial." <u>Greer v. Miller</u>, 485 U.S. 756, 765 (1987) (quoting <u>United States v. Bagley</u>, 473 U.S. 667 (1985)). Any claim of prosecutorial misconduct must be reviewed within the context of the entire trial. <u>Id</u>. at 765-66; <u>United States v. Weitzenhoff</u>, 35 F.3d 1275, 1291 (9th Cir. 1994). The court must keep in mind that "[t]he touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor" and "the aim of due process is not punishment of society for the misdeeds of the prosecutor but avoidance of an unfair trial to the accused." <u>Smith v. Phillips</u>, 455 U.S. 209, 219 (1982). If prosecutorial misconduct is established, and it was constitutional error, the error must be evaluated pursuant to the harmless error test set forth in <u>Brecht v. Abrahamson</u>, 507 U.S. 619 (1993). <u>See</u> <u>Thompson</u>, 74 F.3d at 1577 (Only if constitutional error is established "would we have to decide whether the constitutional error was harmless.").

c. <u>Analysis</u>

In addition to being procedurally barred, the claims of prosecutorial misconduct are without merit. Petitioner cites numerous instances where he contends the prosecutor acted inappropriately, whether in conducting voir dire, questioning witnesses, violating pretrial orders, or making arguments without foundation or based on false evidence. Petitioner fails to show how any of these instances prejudiced him to the level of a constitutional violation.

Petitioner faults counsel for asking questions during voir dire about adultery. No prejudice could have occurred since it was beyond dispute at trial that Petitioner was having an affair with Ms. Coleman prior to the homicide. As to his questioning of witnesses, the trial court is well equipped to deal with counsel's courtroom conduct. Where counsel's behavior runs afoul of the rules of court, opposing counsel may object or the trial court may admonish counsel. In this case, defense counsel did not object to most of the instances the petitioner cited, and where he

did, the trial court found counsel's actions were either appropriate, or it took ameliorative action.
With respect to counsel's alleged violations of in limine orders, there is no Supreme Court
authority which holds that violating a pretrial order also violates the petitioner's constitutional
rights. Again, it is the trial court's task to determine whether counsel's actions are permissible.
To the extent that a trial court alters its pretrial orders, there is no Supreme Court authority which
holds this to be a constitutional violation. As to counsel's arguments made without foundation or
concerning false evidence, it is the jury's task to determine whether counsel's arguments were
supported by the evidence. The jury was instructed that nothing counsel said was evidence, and
they were only to consider the evidence elicited from witnesses. (Doc. 71-5 at 21.) The jury is
presumed to follow its instructions, and in this case, there is no indication the jury failed to do so.

From the record, a fairminded jurist could conclude that none of the prosecutor's actions
could reasonably be seen as "infect[ing] the trial with unfairness as to make the resulting
conviction a denial of due process." Donnelly, 416 U.S. at 643.

4.      Ineffective Assistance of Counsel

Petitioner argues that defense counsel rendered ineffective assistance by inadequately
arguing for admission of Dr. Volk's autopsy report, failing to object to multiple misstatements of
facts and evidence by the prosecution, and failing to present available medical evidence on the
decedent's health concerning her alleged heart problem.

This claim was raised on state habeas review. In the last reasoned decision, the Kern
County Superior Court rejected the claim as follows:

> Petitioner contends that his counsel was ineffective due to the above-mentioned
> errors, and that ineffectiveness caused prejudice to him resulting in the guilty
> verdict.
>
> To prevail on a claim of ineffectiveness of counsel, petitioner must show that
> counsel's representation fell below professional norms, that is, but for that
> ineffectiveness, there would be a probability of a change in the outcome.
> (*Strickland v. Washington* (1984) 466 U.S. 668, 694.) The claim must be grounded
> in reality, and not a figment of petitioner's imagination. (*In re Avena* (1996) 12
> Cal.4th 694, 727; *In re Sixta* (1989) 48 Cal.3d 1247, 1257.)
>
> . . .
>
> [¶] . . . . The appellate court found no error by the court's refusal to admit Dr.
> Volk's version of the autopsy report. Had Dr. Volk testified, his opinion of blunt

24

force trauma at the hands of another could be harmful to petitioner because it could implicate him in his wife's death. The autopsy report is hearsay since official records must have a proper foundation including authentication of the report. Evidence Code section 1280 states in pertinent part: "evidence of a writing made as a record of an act, condition, or event is not made inadmissible by the hearsay rule when offered in any civil or criminal proceeding to prove the act, condition, or event if all of the following applies: (a) The writing was made by and within the scope of duty of a public employee, (b) The writing was made at or near the time of the act, condition, or event, (c) The sources of information and method and time of preparation were such as to indicate its trustworthiness. This means that Dr. Volk had to take the stand and lay a foundation as to the autopsy and explain why it was reliable. By doing so, Dr. Volk could be subject to cross-examination including offering an explanation as to the cause of the blunt force trauma.

The appellate court independently reviewed the autopsy report and found there was no prejudice caused to petitioner at the hands of his counsel. Where the appellate court rules adversely against petitioner on a point of law, he is precluded from raising it again in habeas corpus. (*In re Waltreus* (1965) 62 Cal.2d 218, 225.) Petitioner's arguments over his representation were raised and rejected on appeal. Petitioner presents no additional evidence to warrant reconsideration by this court. (*Id.*) The 1999 medical reports of sinus conditions, depression, and heart ailments were from 1999 and too remote to the present cause of death. Petitioner argues that these conditions could have caused her death. This is speculation at best, and is excludable under Evidence Code section 352 in that it would lead to confusion of the issues and waste of time. The evidence simply does not support petitioner's contention that she died of a heart attack and that she simply bumped up against a dresser before falling into bed. There was no evidence of prolonged heart disease, or excessive vomitus leading to strangulation.

(Doc. 54-8 at 5-6.)

    a.  <u>Legal Standard</u>

Effective assistance of counsel is guaranteed by the Due Process Clause of the Fourteenth Amendment. <u>Evitts v. Lucey</u>, 469 U.S. 387, 391-405 (1985). Claims of ineffective assistance of counsel are reviewed according to <u>Strickland's</u> two-pronged test. <u>Miller v. Keeney</u>, 882 F.2d 1428, 1433 (9th Cir. 1989); <u>United States v. Birtle</u>, 792 F.2d 846, 847 (9th Cir.1986); <u>see also</u> <u>Penson v. Ohio</u>, 488 U.S. 75(1988) (holding that where a defendant has been actually or constructively denied the assistance of counsel altogether, the <u>Strickland</u> standard does not apply and prejudice is presumed; the implication is that <u>Strickland</u> does apply where counsel is present but ineffective).

To prevail, Petitioner must show two things. First, he must establish that counsel's deficient performance fell below an objective standard of reasonableness under prevailing professional norms. <u>Strickland v. Washington</u>, 466 U.S. 668, 687-88 (1984). Second, Petitioner

must establish that he suffered prejudice in that there was a reasonable probability that, but for counsel's unprofessional errors, he would have prevailed on appeal. Id. at 694. A "reasonable probability" is a probability sufficient to undermine confidence in the outcome of the trial. Id. The relevant inquiry is not what counsel could have done; rather, it is whether the choices made by counsel were reasonable. Babbitt v. Calderon, 151 F.3d 1170, 1173 (9th Cir. 1998).

With the passage of the AEDPA, habeas relief may only be granted if the state-court decision unreasonably applied this general Strickland standard for ineffective assistance. Knowles v. Mirzayance, 556 U.S. 111, 122 (2009). Accordingly, the question "is not whether a federal court believes the state court's determination under the Strickland standard "was incorrect but whether that determination was unreasonable–a substantially higher threshold." Schriro v. Landrigan, 550 U.S. 465, 473 (2007); Knowles, 556 U.S. at 123. In effect, the AEDPA standard is "doubly deferential" because it requires that it be shown not only that the state court determination was erroneous, but also that it was objectively unreasonable. Yarborough v. Gentry, 540 U.S. 1, 5 (2003). Moreover, because the Strickland standard is a general standard, a state court has even more latitude to reasonably determine that a defendant has not satisfied that standard. See Yarborough v. Alvarado, 541 U.S. 652, 664 (2004) ("[E]valuating whether a rule application was unreasonable requires considering the rule's specificity. The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations").

b. Analysis

Petitioner first argues that counsel failed to continue to argue for the admissibility of Dr. Volk's autopsy report despite the trial court already twice having denied his request for its admission. Petitioner argues that counsel should have argued to admit it under Cal. Evid. Code § 1280 as a business record. This claim fails because the state court determined on habeas review that the report was inadmissible under state law as a business record under § 1280. This court is bound by a state court's interpretation of state law. Oxborrow v. Eikenberry, 877 F.2d 1395, 1399 (9th Cir. 1989). Counsel cannot be faulted for failing to make a frivolous argument. James v. Borg, 24 F.3d 20, 26 (9th Cir. 1994) (trial counsel's failure to make a futile motion does not constitute ineffective assistance of counsel).

Petitioner also contends that counsel failed to make numerous objections to the prosecutor's arguments during summation. Petitioner states counsel objected to six of the misstatements he noted but he failed to object to others that Petitioner characterized as based on false evidence or having no evidentiary support. When he asked counsel why he wasn't objecting, counsel stated he would "look like a jackrabbit."

Petitioner's contention fails. He argues that the prosecution's arguments constituted "evidence that is prejudicial against the defense"; however as previously noted, the prosecution's arguments are not evidence at all. The trial court had advised the jury that the prosecution's arguments were not evidence, and that the jury could only consider testimony elicited from witnesses as evidence. Whether an argument by the prosecutor was supported by evidence was a determination for the jury. In addition, defense counsel made several objections, and [w]here an objection previously has been made and overruled, repeated objections to the same subject matter may simply draw the jury's attention to the complained-of argument or perhaps irritate or alienate the jury." Middleton v. Roper, 455 F.3d 838, 850 (8th Cir. 2006). Moreover, counsel has wide latitude in determining the best strategy, particularly during closing arguments. Yarborough v. Gentry, 540 U.S. 1, 5-6 (2003). Also, the Supreme Court has stated that "[w]hen counsel focuses on some issues to the exclusion of others, there is a strong presumption that he did so for tactical reasons rather than through sheer neglect." Id. at 8. Thus, Petitioner fails to show that counsel acted beyond the wide range of legitimate defense strategy when he chose not to object to certain statements.

Finally, Petitioner complains that defense counsel failed to present the decedent's medical records. On habeas review, the state court determined that the medical logs were inadmissible because they were too remote in time and would have led to "confusion of the issues and waste of time." There is no Supreme Court authority which would disallow a trial court's use of these grounds to exclude evidence. Further, Petitioner cannot show prejudice since this evidence would have been inadmissible. Also, the evidence would not have assisted defense given its remoteness in time.

For the above reasons, Petitioner fails to demonstrate that the state court application of

Strickland was objectively unreasonable. The Court should deny the claim.

5.     Ineffective Assistance of Appellate Counsel

Petitioner also faults appellate counsel for failing to raise ineffective assistance of counsel claims concerning the prosecutor's misstatements.

a.   Legal Standard

In challenges to the effective assistance of appellate counsel, the same standards apply as with claims of ineffective assistance of trial counsel. Smith v. Robbins, 528 U.S. 259, 285 (2000); Smith v. Murray, 477 U.S. 527 (1986). In Robbins, the United States Supreme Court indicated that an appellate attorney filing a merits brief need not and should not raise every non-frivolous claim. Robbins, 528 U.S. at 288. Rather, an attorney may select from among them in order to maximize the likelihood of success on appeal. Id. As a result, there is no requirement that an appellate attorney raise issues that are clearly untenable. Gustave v. United States, 627 F.2d 901, 906 (9th Cir. 1980); see also Gillhan v. Rodriguez, 551 F.2d 1182 (10th Cir. 1977). Here, the Court has already concluded that trial counsel was not ineffective under the Sixth Amendment. Therefore, it necessarily follows that appellate counsel could not have been ineffective for failing to raise issues related to trial counsel's incompetence.

Moreover, in California, issues of ineffective assistance of counsel are preferably brought on habeas review in order to enable trial counsel the opportunity to explain the reasons for his or her conduct. People v. Mendoza Tello, 15 Cal.4th 264, 266-67 (1997). Therefore, Petitioner fails to show that the state court rejection of this claim was unreasonable. The claim should be denied.

6.     Trial Court Bias and Error

Finally, Petitioner claims a multitude of errors by the trial court. He alleges the trial court: "(1) did not maintain neutrality in decisions for admission of evidence; (2) did not grant a mistrial/retrial for uncorrectable detrimental statement by witness Bobby Scrivner; (3) implemented rigid controls on defense expert which were not implemented on prosecution expert nor defense expert during direct examination; (4) admitted evidence that violated Miranda; (5) denied instructions on lesser charges when there was evidence in trial to support these instructions; (6) admitted evidence on how to kill someone with poison when it was not related to

28

the crime charged in trial; (7) did not provide instructions on corpus delecti rule; and (8) refused instructions on CALCRIM 356." These claims were raised and rejected in the last reasoned state decision by the Fifth DCA on direct review. The Court will address each claim in turn.

a. Audiotape Evidence and Log Notes

Petitioner alleges the trial court did not act in a neutral fashion when it denied the admission of allegedly exculpatory evidence. He contends the trial court erred in failing to grant the defense motion to admit evidence of an audiotape and the decedent's log notes. This claim was raised and rejected on direct review. In the last reasoned decision, the Fifth DCA stated:

> Prior to trial, defendant filed a brief in support of the use of the entire Hans King tape. He asserted the tape was relevant to the two issues underlying the case: whether Fern died a natural death and whether defendant had a motive to kill her. In particular, he claimed the tape was evidence that he and Fern had discussed a divorce and the tape supported his theory that a divorce was discussed prior to Fern's death. Also, defendant claimed the tape showed that Fern would agree to the divorce, thus undermining a claim that he had a motive to murder her. In addition, defendant argued the tape would corroborate the defense evidence that his relationship with Fern had become platonic, thus explaining why he was having a relationship with Debbie Coleman. In addition, defendant argued that the explanation of the nature of the relationship between himself and Fern partially explained his demeanor after Fern's death.

> During trial, the court ruled tentatively that it was not going to allow the entire tape into evidence. The court believed that most of the tape was irrelevant or would not fall under a hearsay exception. Defendant argued that the tape was relevant because Fern expressed her feelings toward him and discussed him in a positive light. In addition, he argued the tape was relevant to show that he and Fern did not have an intimate marriage. Defendant also claimed that the tape supported his testimony that he and Fern discussed divorce the day before she died. In addition, defendant asserted that showing Fern's emotional distress during the tape supports his theory that stress and bad news could have triggered a heart attack.

> The court found that Fern's statements on the tape were trustworthy and that the tape itself was trustworthy and had not been altered in any way. The court found portions of the tape to be irrelevant or hearsay. The court then went through the transcript line by line, admitting portions and excluding portions.

> The court said that the parties had gone over the transcript that would be provided to the jury following the court's rulings as to what was admissible. The court stated that the parties had stipulated that the transcript was admissible. The court said this was done without waiving any objection.

> Defendant testified that Hans King is a channeler—a person who hears messages from people who have died and passes these messages on to the living. Fern had sessions with King and defendant also had seen King before. King tape-records these sessions. After Fern died, defendant found a tape of the August 14, 2004, session between Fern and King.

The clerk then read portions of the transcript of the session to the jury. This included statements of Fern that she still wanted to continue the relationship. She said defendant told her he wanted a divorce. She said that their relationship had been nonsexual for years. She told King that a few weeks earlier defendant said he wanted to talk and said he wanted a divorce. She said it was a surprise because defendant was her best friend. She asked defendant if there was anything they could do about it or work on it, but he said he did not think so. Defendant told her he was very unhappy and he did not love her anymore. One evening, she asked defendant what if she said no to the divorce. He looked at her in funny manner and did not answer. She said she wanted better reasons for why he wanted a divorce. Fern told King that her friendship relationship with defendant has always been perfect and beautiful. King advised Fern to tell defendant that she would like to know his reasons for a divorce and to say to him that she loves and honors him so much that she would give him a divorce if that is what he really wants. Fern told King that she asked defendant if they could share the house, with separate rooms. Fern wanted to know why defendant would not go along with this if he had nothing else to go to.

Defendant now claims the trial court erred in not admitting the entire tape into evidence. He points to over 10 portions of the tape that should have been admitted. He argues this evidence would have corroborated his testimony that he cared very much about Fern, that he had no desire to see her dead, and that they had a calm and rational discussion culminating in her agreeing to a divorce the day before she died. He contends these portions of the tape that were erroneously excluded would have caused the jury to give greater credence to his testimony. In his reply brief defendant makes specific arguments as to each portion of the tape he now claims should have been admitted but was not.

"Broadly speaking, an appellate court applies the abuse of discretion standard of review to any ruling by a trial court on the admissibility of evidence. [Citations.]" (*People v. Waidla* (2000) 22 Cal.4th 690, 717.) The trial court excluded portions of the taped conversation here because they were irrelevant or, if relevant, did not fall within the state-of-mind exception to the hearsay rule. Relevant evidence is evidence that has any tendency in reason to prove a disputed material fact. (Evid.Code, § 210.) Evidence Code section 1250 contains the state-of-mind exception to the hearsay rule. It provides in pertinent part, "(a) Subject to Section 1252, evidence of a statement of the declarant's then existing state of mind, emotion, or physical sensation (including a statement of intent, plan, motive, design, mental feeling, pain, or bodily health) is not made inadmissible by the hearsay rule when: [¶](1) The evidence is offered to prove the declarant's state of mind, emotion, or physical sensation at that time or at any other time when it is itself an issue in the action; or [¶](2) the evidence is offered to prove or explain acts or conduct of the declarant."

Evidence Code section 1252 states that evidence of a statement is inadmissible if it is not trustworthy. The trial court found the taped statement to be trustworthy. Defendant does not challenge this ruling on appeal.

As previously noted, the trial court went through the entire transcript of the tape page by page and ruled specifically which portions it was admitting and which portions it was excluding. During this review by the trial court the parties were allowed to make specific objections and argue their position to the particular decisions made by the trial court, and at times the court reversed its determination based on the arguments of the parties.

Evidence Code section 354 provides in pertinent part that "[a] verdict or finding shall not be set aside, nor shall the judgment or decision based thereon be reversed, by reason of the erroneous exclusion of evidence unless the court which passes upon the effect of the error or errors is of the opinion that the error or errors complained of resulted in a miscarriage of justice and it appears of record that: [¶] (a) the substance, purpose, and relevance of the excluded evidence was made known to the court by the questions asked, an offer of proof, or by any other means."

We find that to the extent defendant did not offer particularized reasons during the hearing before the trial court for the admission and relevancy of the excluded portions of the tape he has failed to preserve the issue for appeal. The transcript of the tape was a 28–page document. A reading of the document demonstrates that, while portions of the conversation were relevant and portions of the conversation fell within the state-of-mind hearsay exception, not everything in the document met these criteria for admission into evidence. Defendant thus could not rely on an all-inclusive offer of relevancy and purpose for the entire document and was required to make a proper showing for each particular subject area within the document. This is particularly applicable when the trial court extended the opportunity to make the proper showing during the time it meticulously went through each page of the document.

As his first claim of erroneous exclusion defendant argues the trial court should have admitted King's question to Fern asking her if defendant would be willing to go with her to counseling. Fern responded that she had asked defendant if he thought counseling would help and he said no. The court excluded this. Defendant made no comment. Thus, he has waived the argument to this portion of the tape. In any event, defendant's claim has no merit. Defendant argues that this portion of the tape showed that defendant had an unequivocal intention to end the marriage through divorce and did not have a secret plan to kill Fern. In addition, he claims it corroborates that Fern agreed to a divorce on Sunday and that defendant had typed up divorce papers prior to Fern's death.

The state-of-mind exception to the hearsay rule applies to the state of mind of the declarant. Defendant's unequivocal intention to end the marriage does not fall within the state-of-mind exception because he was not the declarant. Additionally, it does not corroborate that Fern agreed to divorce; it shows the contrary—that she wanted to go to counseling to save the marriage.

Defendant's next area of dispute with an excluded portion of the tape is the portion when Fern says to King that defendant always buys her beautiful anniversary cards. He had purchased one for their December 31, 2003, anniversary. Fern told King that the card was beautiful and in the card defendant told her that he loved her. She returned it to defendant because she did not feel that he loved her. The court found this portion of the tape to be irrelevant. Defendant made no comment, thus waiving the issue. Again, defendant's argument for inclusion made for the first time in the reply brief would fail in any event. Defendant claims this evidence would undermine the prosecution's theory that he did not care about Fern and discussed killing her with his daughter that same month and also was relevant to show that he did not deliberately kill Fern when he clearly cared enough to give her a lovely card just a few months prior to her death. Again, the statements do not fall within the state-of-mind exception because they involve defendant's state of mind, not the declarant's.

The third claim applies to Fern's discussion that she thought defendant might have

had an affair with Deborah Channel (not Debbie Coleman). Channel was a heroin addict that Fern and defendant had been helping. Fern suspected that defendant had an affair with her, and Channel had written defendant a love letter. Defendant denied an affair, and Fern felt certain he was telling the truth. Fern said she would take the divorce idea better if she knew it had to do with an affair with Channel.

Court and counsel engaged in a discussion regarding the admission of the portions of the tape discussing Channel. The court found it was confusing because Fern went back and forth during her discussion with King on whether or not she believed defendant had an affair or not. In addition, the court found it to be cumulative. Also, the court found it to be irrelevant as to Fern's state of mind. In response defendant said that his arguments were clear and that the thrust of the tape was that Fern had positive feelings for him. We fail to see how this portion of the tape, which waffled back and forth on whether Fern believed defendant was having an affair, demonstrated positive feelings for defendant. We agree with the trial court that it was confusing. In addition, it was cumulative to the evidence the court did admit from the tape demonstrating that Fern had positive feelings for defendant. The trial court did not err in excluding this portion of the tape.

The fourth area of exclusion defendant claims was error is a long statement by Fern to King regarding her discussions with defendant on ways to save their marriage, and asking him for ways she could improve. The court found that this was all irrelevant. In addition, the court cautioned defendant that this passage demonstrated that Fern was not giving up on the marriage, and that would support the People's case. Defendant did not make any argument on this ruling by the court and has thus waived his objection to the exclusion.

Even if the issue was not waived, the exclusion was not error. Defendant contends this evidence was relevant to show the respectful and noncontentious nature of the relationship, as well as his lack of animosity toward Fern. He argues this portion of the tape shows that he was not someone who became enraged or murderous when Fern questioned his decision to divorce her, but treated her with courtesy and respect. Again it is not defendant's state of mind that is looked at in determining if the declaration meets the state-of-mind exception. In addition, sufficient portions from the tape were admitted to show that the discussions between Fern and defendant did not involve rage or murderous intent. This evidence was cumulative to the other evidence. Defendant argues that calling this evidence cumulative is not a reason to uphold the exclusion because the court's rulings were not made under Evidence Code section 352. Defendant misses the point that if the evidence were cumulative, whether ruled on this ground by the trial court or not, any error in excluding it would be harmless.

After Fern discussed that she asked defendant for ways to improve their marriage, King told her that her hands were tied because it was not in her hands anymore. The following occurred:

"FERN: Yeah, I am damned if I do. And damned if I don't.

"HANS: And you can't stop him from getting a divorce, if he wants one.

"FERN: No?

"HANS: Nope. So, if it is contested divorce, then contest it. But he is not happy. And Fern, to the best of my knowledge you are not happy either with the way it is. So something needs to be done to shine some new light

here. Just like you are trying to do now ah sometimes, when we are depressed or we are not feeling well. We say and do things that in a conscious mind we wouldn't do. I think you are both guilty of that. Okay."

Defendant argued that this was relevant because it showed that King informed her that she could not legally stop defendant from divorcing her and therefore aided defendant's position that she agreed to the divorce the day before she was killed and defendant thus had no reason to murder her. Defendant argued that you could infer that she followed the advice of King and agreed to a divorce. The trial court disagreed and said that you cannot tell what it means exactly and reading the transcript in context the court thought it was inferable that Fern thought she could work things out with defendant. The court admitted a later portion of the transcript when King advises Fern to tell defendant she will agree to the divorce if that is what he really wants. The court believed that this later discussion covered the subject. We agree with the trial court that the portion of the excluded transcript was ambiguous and cumulative.

The fifth area of exclusion was Fern's expression of concern about what defendant would do if he were alone. She stated that he was a mess when he was alone before they got together, and she feared he would not be able to function on his own again. The court excluded this as irrelevant. Defendant did not object to the court's exclusion of this evidence and has waived it. In any event, we reject defendant's assertion that this was circumstantial evidence of the nature of their friendship and the lack of animosity in their relationship. Again, we find this evidence cumulative to the other evidence admitted. In addition, it could be argued from this evidence that Fern was less likely to give defendant a divorce because she was so concerned for him. Any error in excluding the evidence was harmless.

Defendant claims it was error to exclude King's advice to Fern to discuss looking at the finances and how they were going to run the business. The court found this was irrelevant. Defendant did not offer a reason for relevance at trial, other than his general, overall reasoning; thus he has waived the issue. In addition, this was not a statement by Fern; it was a statement by King. There was adequate evidence from which the jury could infer that defendant and Fern discussed divorce the day before she was murdered. The other portions of the tape admitted at trial clearly demonstrate that Fern spent a great deal of time discussing with King the divorce situation she was facing.

Next, defendant argues that the court erred in excluding Fern's statements about planned trips to Big Bear and Las Vegas. The court found this discussion irrelevant. Defendant offered no dispute to the court's ruling and has waived the issue. We again reject defendant's argument that these incidental facts would have shown the friendly nature of their relationship and he was prejudiced by their exclusion. We additionally note that in discussing these trips Fern said that she was hoping to hold the relationship together, including to the time of the Christmas Las Vegas trip, and spending time together would give them this opportunity. This undercuts the defense argument that Fern was resigned to a divorce and agreed to it on Sunday. Defendant was not prejudiced by the exclusion of this evidence.

During her discussion with King, Fern commented that they had a 13–year–old cat. She said she asked defendant, "What are you gonna do about Merlin [the cat]? Are you gonna leave the baby? I mean you know I am not gonna give you the baby." The court found this was irrelevant. Defendant claims this demonstrates that Fern was looking at the practical realities of a divorce and supports the defense theory that she would consent to a divorce. Again, lack of objection

waives the issue. In any event we read this passage quite differently. It shows that Fern had one more reason to offer to defendant to not leave because he had feelings for the cat and she was not going to let him take the cat if they divorced. Defendant was not prejudiced by the exclusion of this portion of the transcript.

Fern discussed her health with King. She stated she had been having terrible sinus problems. In addition, she said, "I get strangled real easy." The court excluded that testimony because it had no idea what was meant by the comment and it would require pure speculation to come up with a meaning for what Fern said. Defendant previously argued that this evidence was relevant to show that Fern gagged at night and to support defendant's testimony that she did so. We agree with the trial court that determining the meaning of the statement would require pure speculation. Something that is purely speculative is not relevant. The trial court did not err in excluding this evidence.

<u>Brooks</u>, 2008 WL 2897093, at *20–26.

The claim fails because there is no Supreme Court authority that squarely addresses whether a discretionary decision to exclude evidence violates a defendant's constitutional right to present relevant evidence. <u>Moses v. Payne</u>, 555 F.3d 742, 758-59 (9th Cir. 2009). For this reason, Petitioner cannot show that the exclusion of portions of the audiotape violated his constitutional rights, and habeas relief is unauthorized. <u>Wright v. Van Patten</u>, 552 U.S. 120, 125-26 (2008).

Further, the state court reasonably determined that the excluded portions of the audiotape were irrelevant, cumulative, or non-prejudicial. A fairminded jurist could conclude that none of the highlighted portions would have aided Petitioner, and clearly would not have altered the outcome of the trial.

b. <u>Statement by Witness</u>

Petitioner contends that witness Bobby Scrivner testified at one point that for several years she thought Petitioner was a child molester. Defense counsel immediately objected and requested a mistrial during a side bar conference. The court denied the motion for mistrial, but ordered the statement stricken and admonished the jury to disregard the statement. Defense counsel requested a mistrial again but the court denied. Petitioner contends that the trial court's admonishment could not cancel the negative effect of the statement and deprived him of a fair trial.

This claim was also rejected on direct review as follows:

Fern's daughter, Bobby, testified for the prosecution. Bobby was asked about her

34

(Bobby's) relationship with defendant. She replied, "I had problems with her marrying Rowan [defendant]. I didn't want her to marry him. I never liked him, didn't trust him. I thought for a lot of years that he was a child molester. I did not want him around my daughter."

Defendant immediately objected. A recess was taken. The court then admonished the jury as follows: "Ladies and Gentlemen, when a witness is testifying, and if they have a bias for or against the defendant or another witness, of course you should consider that in determining whether or not the witness is credible. [¶] With that, you are to absolutely disregard any comment that the witness thought the defendant had inappropriate conduct with children or was a child molester. There is absolutely, positively no evidence whatsoever the defendant ever molested any child. [¶] Having said that, you are to disregard that, and I am to strike that from the testimony. The witness' comments ... that she did not want him to marry her mother, or that she didn't like him or didn't trust him, that is evidence you can use, if you choose to, to differentiate whether or not this witness is credible or not. But you are to disregard the other comment."

Defendant made a motion for mistrial, asserting that this type of information poisons the minds of jurors and you cannot unring the bell once something like this has been said. The court denied the motion, finding that its admonition to the jury cured any prejudice that may have resulted from Bobby's comment.

Defendant raised the same issue in his motion for new trial, claiming the remark was so extremely damaging, inflammatory, and negative that an admonition by the court could not cure the damage caused by the remark. Defense counsel argued that the bell could not be unrung in this situation. The court denied the motion, finding that the admonition that was given was sufficient.

Defendant now claims the trial court erred in denying the motion for mistrial and motion for new trial based on Bobby's testimony that she thought defendant was a child molester. Defendant argues that the evidence in this case was extremely close and Bobby's testimony labeling defendant as a child molester was incurably prejudicial.

"The issue here is whether the witness's comment was so incurably prejudicial that a new trial was required. 'A mistrial should be granted if the court is apprised of prejudice that it judges incurable by admonition or instruction. [Citation.] Whether a particular incident is incurably prejudicial is by its nature a speculative matter, and the trial court is vested with considerable discretion in ruling on mistrial motions.' [Citation.] A witness's volunteered statement can, under some circumstances, provide the basis for a finding of incurable prejudice. [Citations.]" (*People v. Ledesma* (2006) 39 Cal.4th 641, 683.)

Although we recognize that being labeled a child molester can be a very damaging statement, the comment by Bobby that she thought defendant was a child molester was not incurably prejudicial. First, it was abundantly clear that Bobby did not care for defendant for numerous reasons, including that she believed he had killed her mother. Additionally, the content of Bobby's comment indicates that she had thought he was a child molester, but she no longer thought he was. This is certainly less prejudicial than if she had said that defendant was and is a child molester. Most important, the trial court instructed the jury that, "[t]here is absolutely, positively no evidence whatsoever the defendant every molested any child." Unlike cases where a witness inadvertently tells the jury something that is derogatory to the defendant and also factually true (for example that defendant is

35

on parole, or is an ex-convict, etc.) and the court is able to admonish the jury to disregard the comment but unable to refute the truth of the statement, here, in addition to telling the jury to disregard the comment, the court was able to inform the jury that there was absolutely no factual basis to support the allegation made by Bobby. Thus any prejudice from the comment was significantly weakened by the court's admonition.

"It must be presumed that the jurors acted in accordance with the instruction and disregarded the ... answer." (*People v. Cox* (2003) 30 Cal.4th 916, 961.) A trial court has considerable discretion in making an assessment of whether the defendant will suffer prejudice that is incurable. (*People v. Davis* (2005) 36 Cal.4th 510, 554.) The trial court did not err in denying the motion for mistrial or the motion for new trial.

Brooks, 2008 WL 2897093, at *19–20.

A criminal defendant has a due process right to be tried by "a panel of impartial, 'indifferent' jurors." Irvin v. Dowd, 366 U.S. 717, 723 (1961); Jeffries v. Blodgett, 5 F.3d 1180, 1189 (9th Cir. 1993). However, "[h]abeas relief is usually warranted only if the alleged constitutional errors had a 'substantial and injurious effect or influence in determining the jury's verdict.'" Jackson v. Brown, 513 F.3d 1057, 1069–70 (9th Cir. 2008) (quoting Brecht, 507 U.S. at 637); see also Fry v. Pliler, 551 U.S. 112 (2007).

In this case, the Fifth DCA determined that any error was harmless. This court agrees. As explained by the state appellate court, the trial court admonished the jury that there was absolutely no evidence that the petitioner had ever molested a child. In addition, it was clear that the witness was antagonistic and biased against the petitioner. Further, the witness stated that she had previously thought he was a child molester, implying she no longer did. As stated by the appellate court, this is substantially less damaging than a statement that the witness believed he was and still is a child molester. Finally, the jury was instructed that the statement had been stricken and they were to disregard it.

We normally presume that a jury will follow an instruction to disregard inadmissible evidence inadvertently presented to it, unless there is an "overwhelming probability" that the jury will be unable to follow the court's instructions, Richardson v. Marsh, 481 U.S. 200, 208 (1987), and a strong likelihood that the effect of the evidence would be "devastating" to the defendant, Bruton v. United States, 391 U.S. 123, 136 (1968).

Greer v. Miller, 483 U.S. 756, 766 n.8 (1987). Here, there is no reason to believe the jury did not follow the curative instructions. Thus, the state court reasonably determined that the statement

36

did not have had a substantial and injurious effect on the verdict. The claim should be rejected.

c. <u>Treatment of Witnesses</u>

In his next claim, Petitioner contends the trial court erred in the manner it treated witnesses for the prosecution as compared to witnesses for the defense. He states the court placed rigid controls on the defense expert whereas the court did not with the prosecution expert. He contends that the biased treatment of the defense expert caused the expert's opinion to be ignored.

Petitioner raised this claim on direct appeal. The Fifth DCA rejected it in a reasoned decision, as follows:

> Defendant cites a series of rulings and comments made during the testimony of his expert pathologist, Dr. Comparini. He claims the trial court erred in refusing to admonish jurors that the hearsay contained in the prosecutor's question could not be considered for the truth, and asserts the trial court actually informed jurors that experts could rely on such information. Next, he argues the trial court erred in refusing to allow Dr. Comparini to say she had relied on Dr. Dollinger's opinion (see pp. 44–45, *post*), and finally he cites a long series of exchanges between the prosecution, Dr. Comparini, and the trial court and contends the trial court improperly discredited her testimony and erred in not letting her explain her answers.

> a. Prosecutor's Questions About Reports Reviewed by Dr. Comparini

> Dr. Comparini testified that she received materials to review in forming her opinion. These materials included the autopsy report prepared by Dr. Volk, the report of the coroner's investigation, documents from the crime laboratory, police reports, a letter from Dr. Wagner, and medical records two or three inches thick.

> Regarding her opinion that Fern died from cardiac arrhythmia and that Fern had moderate to severe fat in her right ventricle, Dr. Comparini was questioned about Fern's history of heart problems. She was asked if Fern's medical records indicated there were abnormalities with her heart. Dr. Comparini said abnormalities of Fern's heart were shown in the electrocardiograms and in her answers to doctors' questions when she said she was dizzy and had heart palpitations.

> During cross-examination by the prosecution, Dr. Comparini was asked if she had reviewed the report of Deputy Coroner Jeff Cameron. She said that she had. The following then occurred:

>> "Q. [Prosecutor] And so, I take it, that when you—you opined this morning that the [electrocardiograms] or EKGs were abnormal, that you were aware that Jeff Cameron had contacted Dr. Shiue, Ms. Fox's[ ] physician, and, although she did have a history of anemia as you indicated, Dr. Shiue indicated that she had no history of heart disease?

>> "MR. EYHERABIDE [Defense Counsel]: I'm going to object as double hearsay.

>> "THE COURT: I think she's relied upon this; so overruled.

37

"BY MS. GREEN [Prosecutor]:"Q. Specifically, just to expedite things, the last—

"MR. EYHERABIDE: Objection.

"BY MS. GREEN:"Q. I'm referring to the last paragraph.

"MR. EYHERABIDE: I'd ask that we admonish the jury that the statement is not being accepted for the truth.

"THE COURT: Well, an expert can rely upon other doctor's reports. And so I will end up instructing you as to the value of that; so this expert can rely upon the other doctors' reports. And then you'll be instructed further upon that. I will leave it that way for now."

Dr. Comparini said she could not and did not use the information from Fern's treating physician in forming her opinion.

Defendant now claims the trial court erred in refusing the defense request for an admonition that Dr. Shuie's statement to Mr. Cameron was not admissible for its truth.

We disagree with defendant's characterization of his claim. The information regarding Dr. Shuie and Mr. Cameron was contained within the prosecutor's question. It was not an answer that was admitted into evidence. The jury was instructed, "Nothing the attorneys say is evidence.... [T]heir questions are not evidence.... [¶] The attorneys' questions are significant only if they helped you to understand the witnesses' answers. [¶] Do not assume that something is true because just one of the attorneys asked a question that suggested it was true." The jury was allowed to know that Dr. Comparini did not rely on the report of Fern's treating physician in reaching her conclusions. The question was not evidence, and the instruction to the jury made this clear. There was no error.

    b.  Exclusion of Testimony Regarding Reliance on Dr. Dollinger's Opinion

On direct examination, defense counsel asked Dr. Comparini if she knew Dr. Dollinger. She said she did know him, he was a forensic pathologist, but he was now dead. The People objected based on relevance and foundation grounds. An unreported sidebar was held and the court struck all references to Dr. Dollinger.

At a later point the parties put the discussion of the Dr. Dollinger issue on the record. Defense counsel read from the police report of Detective Church. In that report Church stated he met with Dr. Dollinger. Dr. Dollinger had examined the photographs and also examined Fern's remains and came to the same conclusion as Dr. Volk. Defense counsel stated he was going to ask Dr. Comparini if she relied on the opinion rendered by Dr. Dollinger, as noted in the report. The district attorney stated that Dr. Dollinger did not prepare a report, that Dr. Dollinger was dead, and that defense counsel did not articulate during the sidebar conference that Dr. Dollinger actually examined Fern's body. Without a report prepared and without the ability to question Dr. Dollinger, because he was dead at the time of trial, the People argued that in such a situation the accuracy of the police report might be questionable and that it would be inappropriate to ask Dr. Comparini questions about Dr. Dollinger's opinion under these circumstances.

The trial court agreed that one expert cannot simply testify what another expert has said without some type of basis for it and the court did not see the basis here.

Defendant contends the trial court erred in disallowing questions of Dr. Comparini regarding her reliance on Dr. Dollinger's opinion. He argues that experts may testify to sources on which they base their opinion and thus the trial court erred.

Here we interpret the trial court's statement that it did not "see the basis here" as agreement with the People when they pointed out that Dr. Dollinger's opinion was contained in a police report and the reliability of that report on the subject of Dr. Dollinger's opinion was questionable. "[T]he court may "'exclude from an expert's testimony any hearsay matter whose irrelevance, unreliability, or potential for prejudice outweighs its proper probative value."' [Citation.]" (*People v. Catlin* (2001) 26 Cal.4th 81, 137.) Defendant offers no explanation now as to why the trial court erred in excluding the evidence as unreliable.

We find the trial court did not err in excluding evidence that Dr. Comparini relied on Dr. Dollinger's opinion since Dr. Dollinger was not available to be questioned, there was no report made by Dr. Dollinger memorializing his opinion, and the police report was not an adequately reliable source for Dr. Dollinger's opinion.

      c.   Trial Court's Rulings and Admonishments During Dr. Comparini's Testimony

Quoting a long litany of passages from the cross-examination of Dr. Comparini, defendant contends the trial court engaged in misconduct when it required Dr. Comparini to give unqualified affirmative or negative answers and made comments that the jury would perceive as indicating that the court did not believe her testimony or that otherwise discredited her testimony.

Defendant cites *McGuire v. Baird* (1927) 9 Cal.2d 353 as support for his argument that it is error for a trial court to require an expert witness to give unqualified affirmative or negative answers. In *McGuire*, counsel for the plaintiff spent more than half a day stating the hypothetical question. Defense counsel insisted that the expert must answer the question with a yes or no answer. The trial court ordered the witness to do so. The California Supreme Court stated it was in accord with the Court of Appeal that found it was error to require a yes or no response and additionally the defendant had agreed that it was error.

*McGuire* does not stand for the broad proposition that an expert witness may never be asked questions that require a yes or no answer and defendant has not cited any authority that supports such a position.

We have reviewed the reporter's transcript of the cross-examination of the expert and reject defendant's argument that the trial court's comments to the expert were misconduct. It is clear from the record that the defense expert witness, Dr. Comparini, repeatedly attempted to answer questions in the manner that she wished to and not in response to the call of the question. In addition, Dr. Comparini had a very argumentative demeanor while being questioned by the prosecution. The trial court did nothing more than attempt to control the proceedings and have the witness answer the questions that were asked of her.

In any event, defendant waived the issue of judicial misconduct. Although he objected to some of the questions asked by the prosecutor, he never raised a claim of judicial misconduct in the trial court. "We determine the propriety of judicial

comment on a case-by-case basis in light of its content and the circumstances in which it occurs. [Citation.] To preserve the issue for review, a defendant must make a timely objection. [Citation.]" (*People v. Cash* (2002) 28 Cal.4th 703, 730.)

Brooks, 2008 WL 2897093, at *27–30.

As previously noted, the Supreme Court has never squarely addressed "whether a court's exercise of discretion to exclude expert testimony violates a criminal defendant's constitutional right to present evidence." Moses, 555 F.3d at 758. This is fatal to Petitioner's claim that the court erred in admitting evidence of Dr. Shiue's statement to Dr. Cameron. Moreover, the statement was not admitted into evidence. It was within the form of the prosecutor's question, and the jury instructions were clear that counsel's questions were not evidence.

Likewise, there is no Supreme Court authority which would bar a trial court from exercising discretion in disallowing expert testimony. As noted in the state court opinion, Dr. Dollinger did not prepare a report and he was dead at the time of trial. The only source for Dr. Dollinger's opinion was contained in a police report. The trial court reasonably determined that this was not an adequately reliable source. The state court reasonably found that the trial court did not err in not permitting the defense expert to testify regarding her reliance on Dr. Dollinger's opinion.

Finally, the state court reasonably determined that there was no evidence of judicial bias by the trial court. Due process demands that the trial judge be unbiased. In re Murchison, 349 U.S. 133, 136 (1955); Bracy v. Gramley, 520 U.S. 899, 904-05 (1997). A judge is unconstitutionally biased if he has a deep-seated favoritism or antagonism that makes fair judgment impossible." Mayberry v. Pennsylvania, 400 U.S. 455, 465-66 (1971). The Supreme Court has held that "judicial rulings alone almost never constitute a valid basis for a bias or partiality motion." Liteky v. United States, 510 U.S. 540, 555 (1994). In this case, the Fifth DCA correctly noted that the trial judge did nothing more than attempt to control the proceedings and to have the witness answer the questions asked of her. There is no evidence of judicial bias in the record.

    d.   Miranda violation

Petitioner contends that the admission of Petitioner's videotaped statement, including the

portion showing him cleaning his fingernails, violated his <u>Miranda</u>[3] rights. He alleges he was subjected to custodial interrogation and was never read his <u>Miranda</u> warnings prior to questioning.

This claim was raised and rejected on direct review, as follows:

On the day of Fern's death defendant was interviewed at the police department. The interview was being audio- and videotaped by a hidden camera. During the interview detectives asked defendant if he would be willing to give fingernail scrapings. He agreed to do so. When the officers left the interview room, defendant began methodically cleaning the tip of each of his fingers with his mouth.

Prior to trial, defendant filed a motion to exclude the admission of this videotape. At the hearing on the motion, the People claimed they were not seeking to admit any statements made by defendant during the interview, but were seeking only to admit the video portion showing defendant sucking on his fingernails. They sought to admit the evidence as proof of consciousness of guilt by defendant.

Defendant sought to exclude the evidence and argued that the interrogation at the police department was conducted in violation of *Miranda* (*Miranda v. Arizona* (1966) 384 U.S. 436) and the fingernail incident would not have occurred absent the *Miranda* violation.

The People argued that the court need not decide the *Miranda* issue because the fingernail incident was nontestimonial and thus admissible whether the interrogation was in violation of *Miranda* or not. The court decided it would hold a full evidentiary hearing to determine if defendant's Miranda rights were violated.

At the hearing, Bakersfield police officer Joseph Aldana testified that he was asked to go to defendant's residence and to stand by and wait for two detectives. Aldana went to defendant's residence. He was joined there by Officer Middleton. When he arrived, he told defendant that they were there regarding the death of his wife and that other detectives would be joining them shortly. Middleton and Aldana remained at defendant's apartment for 20 to 30 minutes. During this time, defendant was free to move about his apartment, but the officers kept an eye on him.

Detective Church called Aldana and asked Aldana to see if defendant was willing to come to the police station for an interview. Aldana asked defendant if he would come to the police station regarding his wife's death. Defendant agreed to come to the station. As they prepared for their departure from defendant's home, defendant started to get his jacket. Aldana noticed that the pockets of the jacket were bulging. For officer safety defendant was asked to remove things from his pockets and leave the items at home.

Defendant asked to drive his own car to the police station. The officers told him that they would give him a ride there and back. He replied, "That's fine." Defendant was searched prior to being placed in the patrol car to make sure he did not have any weapons. Defendant was not handcuffed and was seated in the rear of

---

[3] <u>Miranda v. Arizona</u>, 384 U.S. 436 (1986.)

the patrol car. It took about 10 minutes to drive to the police station. The doors in the back seat of the patrol car could not be opened by a back-seat passenger.

When they arrived at the police station, defendant was taken to an interview room on the second floor. Middleton told defendant to have a seat and if he needed anything detectives would be with him shortly. Defendant was in the interview room for approximately 40 minutes before the interview. Defendant asked to use the restroom. Middleton escorted him to the restroom and then back to the interview room. Middleton testified that they do not typically allow civilians to wander around on the second floor.

The interview was conducted in the interview room with Aldana and Detective Church. The door to the room was partially open. Defendant was given something to drink. Defendant was not aware that the room had a hidden camera and that the interview was being taped.

Defendant testified to a somewhat different version of events. He said that while the two officers were at his house they followed him wherever he went. When defendant went to the bathroom, Middleton followed him and stood by the door. Defendant wanted to make a telephone call but he was told he could wait until the officers were done. When they began to leave for the police station, defendant went to get his jacket. The officers wanted to see what defendant had in his pockets. He started to empty the pockets of his jacket and Middleton said he would empty the pockets for him. Middleton reached from behind defendant and emptied the pockets for him. He was told to leave his jacket at home.

When defendant was asked if he would be willing to come to the police station for an interview, he asked, "They can't get here?" The officers told him no, they wanted to meet him halfway. Defendant said he would drive. He was told no, that he would ride with the officers.

Defendant testified that Middleton stood by the door of the interview room until Church and Aldana arrived. Middleton escorted him to the restroom, stood outside the door, and escorted him back to the room. Defendant brought up the subject of a lawyer three or four times during the interview. He did not know the interview was being taped. Defendant felt trapped at the interview desk with two detectives between him and the door. Although the door was not locked, defendant felt it was not possible to leave.

On cross-examination defendant testified that he consented to go to the police station, but he felt forced to go and did not feel he had a choice. He testified that at the beginning of the interview there was a spirit of cooperation.

In addition to the above testimony, the trial court viewed the videotape. During the beginning of the interview, Church was asking defendant general questions about Fern's medical background, her family, and their neighborhood. Church then told defendant that the coroner found some bruises on Fern and particularly focused on bruising on her neck. Defendant explained that Fern fell down several times and he helped her up. He said she hit the cabinet during one fall. Defendant explained that he woke up and saw Fern lying face down, which was unusual for her. He rolled her over and checked on her. She was dead and he called 911.

Church then told defendant that from the autopsy it appeared that Fern died while she was on her back. Aldana then questioned defendant saying, "So what are we supposed to think?" Church then informed defendant they would like to take

scrapings from underneath his fingernails. Defendant said, "Okay." Church told him this was totally voluntary.

The following exchange took place:

"Brooks [defendant]: I don't know, the way this thing is going, I almost think I need an attorney.

"Aldana: You do? How come?

"Brooks: Well, I, I don't know, I'm, I'm willing to cooperate.

"Aldana: We appreciate your cooperating.

"Brooks: UNINTELLIGIBLE do, but, part of the things is, uh, some of the things you're saying there, I don't have answers to.

"Church: Well, that's why, that's why we're asking you.

"Aldana: Not everybody does.

"Brooks: hmm, hmm,

"Church: If I had the answers to everything, I certainly wouldn't be here.

"Brooks: Well, I don't think he would either, your job's to look for the answers.

"Church: Well, you know, I'm trying to keep this low key and everything, you know, do it with your cooperation, you know, things do happen. So, you are willing to give the fingernail scrapings?

"Brooks: Hmm, hmm,

".........................

"Church: Hey, is this Destinie, uh, this is Chuck. Can you take some fingernail scrapings? Okay, we're up on the second floor. Room 233. Alright, I'll meet you in the hallway."

The officers left the interview room. During their absence defendant can be seen methodically putting each finger in his mouth in a motion that looks like he is cleaning each fingernail with his teeth.

The trial court found that defendant was not in custody at the time of the fingernail incident. The court further found that, even if defendant was in custody, the fingernail incident was admissible because it was nontestimonial. The court went on to find that the interview became custodial at some point after the fingernail incident. The court granted defendant's motion to exclude the statements made by him during the interview because the People were not asking for admission of the statements. The court denied defendant's motion to keep the jury from viewing the videotape of the fingernail incident.

Defendant contends the trial court erred in admitting the videotape because it violated his *Miranda* rights and also because his consent to the fingernail scrapings

43

was a result of the officers' ignoring his request for counsel. Defendant goes on to argue that the videotaping of the fingernail incident was testimonial because it was communicative conduct. He contends the police used a psychological ploy functionally equivalent to interrogation to elicit the communication (sucking on the fingernails). Defendant claims the error requires reversal.

"We review independently a trial court's determinations as to whether coercive police activity was present and whether the statement was voluntary. [Citation.] We review the trial court's findings as to the circumstances surrounding the confession, including the characteristics of the accused and the details of the interrogation, for substantial evidence. [Citation.] '[T]o the extent the facts conflict, we accept the version favorable to the People if supported by substantial evidence.' [Citation.]" (*People v. Guerra* (2006) 37 Cal.4th 1067, 1093.)

"After being taken into custody by police or otherwise deprived of his or her freedom of action in any significant manner, a person must be given *Miranda* warnings apprising the person of his or her right to remain silent, that any statement the person makes may be used against the person and that the person has the right to counsel, retained or appointed. [Citation.] Statements elicited in noncompliance with this rule may not be admitted for certain purposes in a criminal trial. [Citations.]" (*In re Kenneth S.* (2005) 133 Cal.App.4th 54, 63.)

"The due process [voluntariness] test takes into consideration 'the totality of all the surrounding circumstances—both the characteristics of the accused and the details of the interrogation.'" (*Dickerson v. United States* (2000) 530 U.S. 428, 434.) "*Miranda* made clear that the rule was only applicable to custodial interrogation, which means, 'questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way.' [Citation.] In determining whether an individual was in custody, a court must examine all of the circumstances surrounding the interrogation, but the ultimate inquiry is simply whether there was a '"formal arrest or restraint on freedom of movement" of the degree associated with a formal arrest.' [Citations.]" (*In re Kenneth S., supra*, 133 Cal.App.4th at p. 64.)

We agree with the trial court that the interview of defendant, at least until the point where he agreed to submit to having his fingernails scraped, was not a custodial interrogation.

"Any interview of one suspected of a crime by a police officer will have coercive aspects to it, simply by virtue of the fact that the police officer is part of a law enforcement system which may ultimately cause the suspect to be charged with a crime. But police officers are not required to administer *Miranda* warnings to everyone whom they question. Nor is the requirement of warnings to be imposed simply because the questioning takes place in the station house, or because the questioned person is one whom the police suspect." (*Oregon v. Mathiason* (1977) 429 U.S. 492, 495.)

Defendant voluntarily agreed to go to the police station for questioning. He agreed that it was fine that he ride with Middleton rather than take his own car. Although he was placed in the back of the patrol car and could not open the door by himself, he was not handcuffed and the ride was a brief one. While officers conducted a patdown search before placing defendant in the police car, this was only for officer safety. Defendant was asked to empty his coat pockets for the same reason. At the station the door to the interview room was open. Defendant was allowed to use the restroom and was given a beverage to drink. Although he was accompanied by

Aldana to the restroom, this was because he was in a restricted area of the police station where civilians were not allowed to roam freely. (*In re Kenneth S., supra*, 133 Cal.App.4th at p. 65.) The questioning was very casual at the outset. The questions became more focused on the circumstances surrounding Fern's death, but were not particularly accusatorial at the time defendant was requested to submit to fingernail scrapings. Defendant was an educated man with two master's degrees. He was articulate. In his work as a counselor he had worked with police officers before and had been a witness in cases before the courts. He commonly interacted with police officers.

All of the above circumstances demonstrate under an objective standard that there was no formal arrest or restraint of freedom of movement associated with a formal arrest such that the interrogation was custodial and required *Miranda* warnings. Because defendant was not in custody and *Miranda* warnings were not required, we need not determine if the videotape showing him sucking on his fingernails was testimonial or nontestimonial.

Defendant additionally argues that he made a request for counsel and once that request is made all questioning must cease until counsel is provided. Because defendant was not informed he had the right to counsel, because *Miranda* warnings were not given, he contends this court cannot presume that he understood he had the right to counsel. Defendant asserts that the interrogation proceeded in violation of his right to counsel.

When an interviewee requests the assistance of counsel at any time during an interview, " 'the interrogation must cease until an attorney is present.' " (*Edwards v. Arizona* (1981) 451 U.S. 477, 485.) The court must determine if the accused actually invoked his right to counsel.

" 'To avoid difficulties of proof and to provide guidance to officers conducting interrogations, this is an objective inquiry. [Citation.] Invocation of the *Miranda* right to counsel "requires, at a minimum, some statement that can reasonably be construed to be an expression of a desire for the assistance of an attorney." [Citation.] But if a suspect makes a reference to an attorney that is ambiguous or equivocal in that a reasonable officer in light of the circumstances would have understood only that the suspect *might* be invoking the right to counsel, [the comment does] not require the cessation of questioning. [Citations.] [¶] Rather, the suspect must unambiguously request counsel. As we have observed, "a statement either is such an assertion of the right to counsel or it is not." [Citation.] Although a suspect need not "speak with the discrimination of an Oxford don," [citation], he must articulate his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney. If the statement fails to meet the requisite level of clarity, [it is not required] that the officers stop questioning the suspect. [Citation.]' [Citation.]" (*People v. Simons* (2007) 155 Cal.App.4th 948, 957.)

Defendant did not unequivocally request counsel. Defendant has not cited any authority for the proposition that an equivocal request for counsel before being advised of the right to counsel transforms the equivocal request into an unequivocal request. The mention of counsel before being advised of Miranda rights demonstrates a knowledge of the legal system. We fail to see how this should alter our analysis.

The trial court did not err in admitting the videotape of the fingernail incident.

Brooks, 2008 WL 2897093, at *8–13.

        *i.   Legal Standard*

        The Fifth Amendment provides that "no person shall be compelled in any criminal case to be a witness against himself." A suspect subject to custodial interrogation has a Fifth Amendment right to consult with an attorney, and the police must explain this right prior to questioning. Miranda v. Arizona, 384 U.S. 436, 469–73 (1966). In Miranda, the United States Supreme Court held that "[t]he prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." 384 U.S. at 444. To this end, custodial interrogation must be preceded by advice to the potential defendant that he or she has the right to consult with a lawyer, the right to remain silent and that anything stated can be used in evidence against him or her. Id. at 473–74. These procedural requirements are designed "to protect people against the coercive nature of custodial interrogations." DeWeaver v. Runnels, 556 F.3d 995, 1000 (9th Cir. 2009).

        "Fidelity to the doctrine announced in Miranda requires that it be enforced strictly, but only in those types of situations in which the concerns that powered the decision are implicated." Berkemer v. McCarty, 468 U.S. 420, 437 (1984). Although "those types of situations" may vary, they all share two essential elements: "custody and official interrogation." Illinois v. Perkins, 496 U.S. 292, 296–97 (1990).

        To determine whether an individual was in custody, a court must, after examining all of the circumstances surrounding the interrogation, decide "whether there [was] a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." Stansbury v. California, 511 U.S. 318, 322 (1994) (internal quotation marks omitted). The inquiry focuses on the objective circumstances of the interrogation, not the subjective views of the officers or the individual being questioned. Id. at 323. Thus, the court must determine whether "the officers established a setting from which a reasonable person would believe that he or she was not free to leave." United States v. Beraun–Panez, 812 F.2d 578, 580 (9th Cir.), *modified by* 830 F.2d 127 (9th Cir.1987); see also U.S. v. Hayden, 260 F.3d 1062, 1066 (9th Cir. 2001). The Ninth Circuit

has noted the following factors to be relevant to deciding that question: "(1) the language used to summon the individual; (2) the extent to which the defendant is confronted with evidence of guilt; (3) the physical surroundings of the interrogation; (4) the duration of the detention; and (5) the degree of pressure applied to detain the individual." Hayden, 260 F.3d at 1066 (citing Beraun–Panez, 812 F.2d at 580). "Other factors may also be pertinent to, and even dispositive of, the ultimate determination whether a reasonable person would have believed he could freely walk away from the interrogators; the Beraun–Panez/Hayden factors are simply ones that recur frequently." United States v. Kim, 292 F.3d 969, 974 (9th Cir. 2002).

Error in admitting statements obtained in violation of Miranda is deemed harmless for purposes of federal habeas review unless the error "had substantial and injurious effect or influence in determining the jury's verdict." Brecht v. Abrahamson, 507 U.S. 619, 637 (1993); Ghent v. Woodford, 279 F.3d 1121, 1126 (9th Cir. 2002).

### ii.   Analysis

In this case, the Fifth DCA applied clearly established Supreme Court precedent. Therefore, the question for this Court is whether that application was unreasonable. In light of the record, a rational jurist could conclude that the state court determination that Petitioner was not in custody at the time of the confession was reasonable.

In determining whether suspects are "in custody" for Miranda purposes, the Supreme Court has considered whether they voluntarily approached or accompanied law officers understanding that questioning would ensue. See California v. Beheler, 463 U.S. 1121, 1125 (1982) (per curiam) (holding that defendant was not in custody when he agreed to accompany police to the station to answer questions and was allowed to leave immediately afterward); Oregon v. Mathiason, 429 U.S. 492, 495 (1977) (holding that defendant was not in custody when he came to the station voluntarily and left "without hindrance" after 30 minutes of questioning). The Ninth Circuit has also found that suspects were not in custody where the circumstances included volunteering to answer law officers' questions. See, e.g., Hayden, 260 F.3d at 1066–67; United States v. Hudgens, 798 F.2d 1234, 1236–37 (9th Cir.1986). Here, Petitioner voluntarily accompanied the officers to the police station understanding that he would be answering

47

questions. "If the police ask—not order—someone to speak to them and that person comes to the police station, voluntarily, precisely to do so, the individual is likely to expect that he can end the encounter." Kim, 292 F.3d at 974-75.

However, "[i]f an individual voluntarily comes to the police station or another location and, once there, the circumstances become such that a reasonable person would not feel free to leave, the interrogation can become custodial." Kim, 292 F.3d at 975. In this case, Petitioner was not handcuffed and agreed to ride in the police car to the station. After arriving, he was led to an interrogation room and the door to the room was left open. He was allowed to use the restroom and he was provided a beverage. Initially, the questioning was very casual. Eventually the questioning focused on the victim's death, but at the time he was asked to provide fingernail scrapings, they had not become accusatory. A rational jurist could conclude that the encounter did not become so coercive that a reasonable person in Petitioner's circumstances would not have felt free to leave. See Hayden, 260 F.3d at 1066 (the defendant "was told explicitly that she was free to leave at anytime," her "ability to leave was [not] in any other way restrained," and "the duration of the interviews was [not] excessive[and] undue pressure was [not] exerted"); United States v. Gregory, 891 F.2d 732, 735 (9th Cir.1989) (the defendant "consented to be interviewed . . . and no coercion or force was used"); United States v. Hudgens, 798 F.2d 1234 (9th Cir. 1986) (the defendant voluntarily entered a police car to talk to the police and the agents did not use intimidating or coercive language during the interview). Thus, the state court determination that he was not in custody at the time he was viewed cleaning his fingernails was reasonable.

Petitioner argues that his statement, "I don't know, the way this thing is going, I almost think I need an attorney," was a request for counsel and the interrogation should have immediately ceased. Under Miranda, once an accused has "expressed his desire to deal with the police only through counsel," he may not be "subject to further interrogation by the authorities until counsel has been made available to him. . . ." Edwards v. Arizona, 451 U.S. 477, 484-85 (1981). However, the request for counsel must be unambiguous. Davis v. United States, 512 U.S. 452, 459 (1994). "[I]f a suspect makes a reference to an attorney that is ambiguous or equivocal in that a reasonable officer in light of the circumstances would have understood only

that the suspect *might* be invoking the right to counsel, our precedents do not require the cessation of questioning." Id. (emphasis in original). Here, the state court reasonably determined that Petitioner's statement was ambiguous and equivocal.

Accordingly, Petitioner fails to demonstrate that the state court's determination that Petitioner's constitutional rights under Miranda were not violated was objectively unreasonable. The claim should be denied.

e.     Instructions on Lesser Offenses

Petitioner claims the trial court erred by denying his requests for instructions on lesser included offenses of accident and involuntary manslaughter based on the evidence. He contends that all of the defense evidence pointed to accident and involuntary manslaughter.

In denying this claim, the Fifth DCA stated:

> Defendant requested that the court instruct the jury on accident and also on involuntary manslaughter. The trial court refused to give the instructions, finding that the evidence did not support giving these instructions. Defendant now claims the refusal to give these instructions was error.

> "The trial court has a duty to instruct, sua sponte, 'on general principles of law that are commonly or closely and openly connected to the facts before the court and that are necessary for the jury's understanding of the case.' [Citation.] This includes the duty to give instructions concerning defenses on which the defendant relies or which are not inconsistent with the defendant's theory of the case. [Citation.] The trial court has no duty to instruct on a defense that is not supported by substantial evidence. [Citation.]" (*People v. Bohana* (2000) 84 Cal.App.4th 360, 370 .)

> Defendant argues that his testimony that he had grabbed Fern's neck as she was falling and that her full weight had fallen on his hand as he was attempting to prevent her head from hitting the dresser, in conjunction with Dr. Wagner's testimony concerning the injuries to the neck being the cause of death, constituted substantial evidence that the injuries that resulted in her death were caused by accident or misfortune, and the trial court erred in failing to give the accident or misfortune instruction.

> While defendant did testify that he grabbed Fern's neck as she fell, this mechanism of injury as a cause of death was not supported by any evidence. Dr. Wagner testified that the injuries to the neck were representative of a chokehold being put on the throat and were representative of pressure. It was Dr. Wagner's opinion that Fern died from asphyxiation. As Dr. Comparini testified, it takes a lot of pressure to strangle someone. This evidence does not support a theory of accidental death based on defendant grabbing Fern and his hands slipping to her neck as she fell. The trial court did not err in refusing to give an accident instruction.

> Next, defendant argues the trial court erred in refusing an instruction on voluntary manslaughter. Defendant claims the evidence was sufficient for the jurors to have

49

1  concluded that he committed a misdemeanor battery on Fern and this battery
2  triggered a heart attack.

3  We find that error, if any, in refusing to instruct on involuntary manslaughter was
   harmless. The jurors found defendant guilty of first degree murder; thus they found
   that he carried out a willful, deliberate and premeditated killing with express
4  malice aforethought. The jurors were instructed that to find first degree murder
   they must determine defendant willfully intended to kill, carefully weighed the
5  considerations for his choice, and, knowing the consequences, decided to kill. The
   jurors were instructed that to find that defendant acted with premeditation they
6  must find he decided to kill before committing the act that caused death. They
   were told that all other murders are murders of the second degree.
7
   If the jurors had believed that defendant spontaneously battered Fern and then she
8  died of a heart attack from the stress, they would not have been able to find that he
   decided to kill her before he committed the act and that he carefully weighed the
9  considerations for his choice. In such a situation, the jury would have either
   convicted defendant of the lesser offense of second degree murder or would have
10 acquitted him.

11 The fact that the jury rejected second degree murder and acquittal and instead
   found defendant guilty of first degree murder precludes any possible error in
12 refusing to instruct on involuntary manslaughter. (*People v. Gutierrez* (2002) 28
   Cal.4th 1083, 1145 .)
13
   Defendant argues that the instructional error here resulted in the complete failure
14 to instruct on a defense theory and requires reversal without regard to prejudice.
   The California Supreme Court has held that error in failing to give an instruction
15 on a lesser included offense is subject to review for harmless error. We are bound
   by those decisions and reject defendant's attempt to transform the failure to give a
16 lesser included offense instruction into something else.

17 Brooks, 2008 WL 2897093, at *30–31.

18         i.    Legal Standard

19         As a preliminary matter, the Court notes that any error in the state court's determination of

20 whether state law allowed for an instruction in this case cannot form the basis for federal habeas

21 relief. Estelle v. McGuire, 502 U.S. 62, 71 (1991) (citing Marshall v. Lonberger, 459 U.S. 422,

22 438, n. 6 (1983)) ("[T]he Due Process Clause does not permit the federal courts to engage in a

23 finely tuned review of the wisdom of state evidentiary rules").  "'Failure to give [a jury]

24 instruction which might be proper as a matter of state law,' by itself, does not merit federal

25 habeas relief." Menendez v. Terhune, 422 F.3d 1012, 1029 (quoting Miller v. Stagner, 757 F.2d

26 988, 993 (9th Cir.1985)).  The Supreme Court has stated instead that a claim that a court violated

27 a petitioner's due process rights by omitting an instruction requires a showing that the error "so

28 infected the entire trial that the resulting conviction violate[d] due process." Henderson v. Kibbe,

50

431 U.S. 145, 154 (1977) (quoting Cupp v. Naughten, 414 U.S. 141, 147 (1973)). The burden on Petitioner is especially heavy "where ... the alleged error involves the failure to give an instruction." Clark v. Brown, 450 F.3d 898, 904 (9th Cir.2006).

Even if constitutional instructional error has occurred, the federal court must still determine whether Petitioner suffered actual prejudice, that is, whether the error "had substantial and injurious effect or influence in determining the jury's verdict." Brecht v. Abrahamson, 507 U.S. 619, 637 (1993). A "substantial and injurious effect" means a "reasonable probability" that the jury would have arrived at a different verdict had the instruction been given. Clark, 450 F.3d at 916.

> ii.     Analysis

In this case, Petitioner fails to demonstrate that the trial court's failure was contrary to or an unreasonable application of Supreme Court precedent. As correctly noted by Respondent, although the Supreme Court has held that due process requires the jury be instructed on a lesser included offense in certain instances in a capital case, see Beck v. Alabama, 447 U.S. 625, 638 (1980), it has not squarely addressed whether due process requires lesser included offense instructions in non-capital cases. Solis v. Garcia, 219 F.3d 922, 928 (9th Cir. 2000). The circuits are split on the issue, and the Ninth Circuit has declined to extend the holding in Beck to non-capital cases. Id. at 929. This is fatal to Petitioner's claim. Knowles v. Mirzayance, 556 U.S. 111, 122 (2009).

In any case, the jury convicted Petitioner of first degree murder which necessitated a finding that Petitioner intended to kill, with that intention being premeditated and deliberated. These findings cannot be squared with an accidental killing.

> f.     Admission of Evidence of Poisoning

Petitioner claims the trial court erred in admitting evidence of the discussion Petitioner had with his daughter about killing someone with poison. He states there was no evidence that poison was used and there was no connection to the actual cause of death. He also claims that computer searches of causes of death should not have been admitted because they had no provable connection to the victim's death.

This claim was also presented on direct review. In the last reasoned decision, the Fifth DCA rejected the claim as follows:

Prior to trial, defendant filed a motion to exclude evidence from the computer in defendant's residence showing that someone had conducted searches for methods to poison humans and other searches relating to killing someone. In addition, defendant sought to exclude testimony relating to a conversation he had with his daughter, a nurse, about how to kill someone.

At the hearing on the motion, defendant argued that this evidence added nothing to the question of whether Fern's death was a homicide. In addition, he argued the evidence did not show planning because Fern was not poisoned.

The People contended that they wanted to offer evidence of the websites that were accessed at or near the time of the murder. One was a communication with a chemical company regarding purchasing some chemicals. The e-mail included defendant's business address as the location where items could be sent. The web searches included searches for "murder," "killing humans," "respiratory arrest," "causes of instant heart attacks," "lethal dose levels," "nicotine acid purchase," and "lethal doses of chemicals." In addition, a book was accessed on-line, in particular chapter 5 of "Fast Poisoning" was accessed. This chapter referred to nicotine from plant leaves. These searches began in May of 2004 and continued until August 14, 2004. At trial it was also established that defendant did a search for "chemicals that cause heart attacks."

The People argued this evidence, as well as the December 2003 conversation with his daughter, was relevant to show that defendant had been thinking about and pondering killing his wife for some time, thus proving premeditation.

Defendant asserted that it was misleading to ask a juror to conclude that defendant was premeditating a murder when all that occurred was the use of search terms. Defendant argued there was no connection of these websites to the murder, particularly when there was nothing about strangulation, which appeared to be the cause of death. Defendant claimed there was no logical nexus and the evidence was misleading and prejudicial.

The court found that the People should be able to rely on this evidence to prove premeditation and deliberation. It found that the probative value clearly outweighed the prejudice. The court made the same ruling regarding defendant's conversation with his daughter regarding how to kill someone.

At trial it was established that the computer was in a bedroom off of the kitchen. This room was used as defendant's office. As previously set forth, Jinee testified at trial that she is a registered nurse. Defendant was at a holiday party at her home in December of 2003. Fern was also there, but she was sitting in another room reading. Defendant asked Jinee and her nursing friends how they would kill someone if they were going to do it. Jinee said she would use potassium or succynicholine. Defendant asked why she chose those two chemicals and how one would obtain the chemicals. Jinee explained that she, as a nurse, could not even obtain potassium. Defendant said that he could obtain it. Defendant then asked about giving nicotine to someone to kill them. Jinee explained that it would be difficult to kill someone with nicotine and that the nicotine could be traced.

Defendant contends the trial court erred in admitting the website evidence and

Jinee's testimony regarding her conversation with him. He argues that without proof that the searches were in fact conducted by him the link to him was only a speculative inference and thus the evidence was irrelevant. In addition, he argues the evidence should have been excluded under Evidence Code section 1101 as improper character evidence. He claims such searches "are far more likely to be inspired by viewing an episode of CSI, or by a desire to research methods of committing suicide, or by suspicion about the circumstances of someone else's death, or by a desire to write a short story, than to be motivated by some sinister plot to commit murder." (Fn.omitted.) Finally, he argues the evidence should have been excluded pursuant to Evidence Code section 352 as far more prejudicial than probative. He asserts the admission of the evidence violated his right to a fair trial and requires reversal.

Relevant evidence is any evidence having a tendency in reason to prove or disprove any disputed material fact. (*People v. Garceau* (1993) 6 Cal.4th 140, 177.) Relevant evidence may be excluded if its probative value is substantially outweighed by its prejudice. (Evid.Code, § 352.) In deciding the relevancy of evidence and its probative value the trial court is vested with wide discretion that will not be disturbed on appeal unless there is a manifest abuse of discretion resulting in a miscarriage of justice. (*People v. Cain* (1995) 10 Cal.4th 1, 33.)

"[E]vidence leading only to speculative inferences is irrelevant ." (*People v. Kraft* (2000) 23 Cal.4th 978, 1035.) The court has no discretion to admit irrelevant evidence. (*People v. Babbit* (1988) 45 Cal.3d 660, 681.) Defendant argues that the evidence that he conducted the searches was speculative and therefore not relevant.

Defendant and Fern were the individuals with access to the computer. The computer was in their home. Thus it could be circumstantially inferred that defendant was the person accessing the computer. The inference that defendant conducted the web searches regarding poisoning is even stronger based on defendant's conversation with Jinee involving how to kill someone by poisoning them; in particular, his questions to Jinee involving the use of nicotine was clearly connected to the searches regarding instant causes of heart attacks, purchase of nicotine and nicotine poisoning. It need not be demonstrated with absolute certainty that a piece of evidence is associated with only one person. If this were the case much of the evidence properly admitted at trials would be excluded because it could not be tied unerringly to a defendant. Defendant cites *People v. Olguin* (1994) 31 Cal.App.4th 1355 and *People v. Gibson* (2001) 90 Cal.App.4th 371 as support for his argument that the evidence must be tied to a particular person. These cases involved the authentication of a writing. The issue here is not the authentication of a writing. When the evidence can be circumstantially linked to a particular defendant and is relevant to an issue at trial, the closeness or remoteness of the tie to the defendant goes to the weight of the evidence, not to the relevance of the evidence. The inference that defendant conducted the searches on the home computer was not speculative, as the computer was in defendant's home, and only two people had access to it. In addition, some of the searches were strikingly similar to subjects talked about during his conversation with Jinee. The evidence was relevant because it had a tendency to prove defendant planned and premeditated his wife's murder.

Next, defendant argues that the evidence should have been excluded as improper character evidence. He claims that "party chatter [his talk with his daughter] on morbid subjects and entering search terms concerning methods of poisoning someone has no tendency in reason to prove that the person doing such a search

53

actually was contemplating or planning a murder, at least in the absence of evidence that the method researched was actually used in a later killing." (Fn.omitted.) He claims that criminal activity is a wildly popular subject on television, in writing, and in the news and thus the evidence does not suggest nefarious activity. Defendant goes on to argue that there was nothing in the evidence connecting it with Fern or with strangulation. While these arguments are contained in the subsection of defendant's brief arguing that the evidence was improper character evidence, we find it is merely a rehash of the argument that the evidence was not relevant. As previously stated, the evidence was relevant; any weaknesses in the direct linkage to the killing here goes to the weight of the evidence.

In *People v. Archer* (2000) 82 Cal.App.4th 1380 the defendant was convicted of murder with the personal use of a knife. More than a year after the murder the defendant's home was searched on two separate occasions. "Police recovered two knives from appellant's backyard, three knives from his bedroom, two knives from his workshop and two knives from his storage locker." (*Id.* at p. 1392.) One knife had a presumptive positive reaction for blood and the defendant's codefendant said one of the knives resembled the knife he used to stab the victim.

The defendant objected to the admission of the knives at trial, claiming they were not relevant. The People claimed the knives were relevant to the availability of weapons and to the planning of the murder. The court admitted the knives at trial and defendant argued on appeal that this was error. (*People v. Archer, supra*, 82 Cal.App.4th at p. 1392.) The appellate court agreed.

"The only knives which had any relevance to the crime charged were the knife Baserga [the codefendant] identified as resembling the one he used to stab Pate [the victim], and the knife which had a positive reaction to the test for blood. The knife Baserga identified was not shown to be unique or difficult to acquire, nor was there such a showing as to the knife that was presumptively positive for blood. Hence there was no issue as to appellant's access to such weapons or his need to stockpile knives in order to commit the murder. 'Evidence of possession of a weapon not used in the crime charged against a defendant leads logically only to an inference that defendant is the kind of person who surrounds himself with deadly weapons—a fact of *no relevant* consequence to determination of the guilt or innocence of the defendant.' [Citation.] Admission of the knives other than the two which had some arguable relevance to the case created a risk of that same inference in this case." (*People v. Archer, supra*, 82 Cal.App.4th at pp. 1392–1393.)

In *People v. Smith* (2003) 30 Cal.4th 581 the defendant was convicted of murder and was found to have personally used a firearm during the commission of the murder. Police found a derringer and ammunition in the defendant's house. The derringer was not the murder weapon and the ammunition found in the house did not fit the murder weapon or the derringer. The defendant claimed the trial court erred in admitting this evidence at his trial. He argued that the evidence only tended to show that he was the sort of person who carried deadly weapons. (*Id.* at p. 613.)

The California Supreme Court found it was not error to admit this evidence. "This evidence did not merely show that defendant was the sort of person who carries deadly weapons, but it was relevant to his state of mind when he shot Toyoshima. In his confession and opening statement to the jury, defendant claimed the shooting was an accident and he did not intend to kill her. In his later testimony, he

said he took the gun to intimidate but not to shoot, and he chose the murder weapon because it was small and easy to conceal. Evidence that he possessed another small, easily concealed but unloaded gun and no ammunition that fit it, and that he chose instead to take a loaded gun, was relevant to defendant's credibility on this point. An unloaded gun fully serves to intimidate; a loaded gun is necessary only to actually shoot. Thus, although the ammunition and derringer were not used in the killing, '[t]heir circumstantial relevancy ... seems clear,' and they were accordingly, properly admitted. [Citations.]" (*People v. Smith, supra*, 30 Cal.4th at pp. 613–614, fn. omitted.)

In *People v. Jablonski* (2006) 37 Cal.4th 774 the defendant was convicted of murdering his wife and her mother. The two murder victims were stabbed and shot. A towel had been pushed into the mouth of one victim and the other victim's mouth and nose were covered with duct tape. (*Id*. at pp. 784–785.) The defendant was arrested several days after the bodies were discovered. His vehicle was searched and officers found a roll of duct tape, homemade wire handcuffs, and a stun gun. The defendant objected to the admission of the stun gun and the handcuffs, claiming they were not relevant, and he additionally argued the evidence was improper character evidence. On appeal the defendant challenged the trial court's admission of this evidence. (*Id*. at p. 821.)

The California Supreme Court found the trial court did not err in admitting the evidence. It found that "premeditation was a disputed fact and evidence that defendant carried devices to the crime scene that could have been used to restrain or immobilize the victims was relevant to premeditation.... It reasonably can be inferred from this evidence that defendant planned to take the victims by surprise and also planned to restrain or immobilize them to prevent them from resisting or seeking help." (*People v. Jablonski, supra*, 37 Cal.4th 774 at pp. 821–822.)

The Supreme Court distinguished Archer and other appellate court cases because in "each of these decisions ... the weapons had no relationship at all to the charged crime and, by extension, were not relevant to any issue in dispute." "[T]he items recovered from defendant's vehicle were relevant to premeditation." (*People v. Jablonski, supra*, 37 Cal.4th 774 at p. 822.) "[D]efendant's possession of the stun gun was not admitted to prove disposition but to prove preparation, which was relevant to establish premeditation." (*Ibid*.)

We begin by finding that the items found on the computer from defendant's home are basically no different from other items found in a home. "The Internet is an international network of interconnected computers" which "enable[s] tens of millions of people to communicate with one another and to access vast amounts of information from around the world." (*Reno v. American Civil Liberties Union* (1997) 521 U.S. 844, 849–850.) "The best known category of communication over the Internet is the World Wide Web, which allows users to search for and retrieve information stored in remote computers, as well as, in some cases, to communicate back to designated sites. In concrete terms, the Web consists of a vast number of documents stored in different computers all over the world ." (*Id*. at p. 852.)

The evidence found in defendant's home was not admitted to show that he was a person of bad character; it was admitted on the issue of premeditation and deliberation. We find the facts here to fall more closely within the factual circumstances of *Smith* and *Jablonski*, not *Archer*. Defendant argued in his opening statement that he accidently injured Fern while trying to catch her when she was falling. He testified that Fern was falling and while trying to keep her from hitting her head his hands accidently ended up around her throat. He testified

that Fern was very ill the evening before her death but would not go to the emergency room. The evidence of premeditation and deliberation was clearly in dispute, and the evidence was relevant to prove this disputed issue. It was not improperly admitted as character evidence.

Finally, defendant argues the trial court erred in admitting the evidence pursuant to Evidence Code section 352 because its prejudicial effect outweighed its probative value. As previously set forth, the trial court is vested with wide discretion in admitting this evidence and its ruling will not be disturbed on appeal absent a clear abuse of that discretion.

The evidence was relevant and highly probative on the question of premeditation and deliberation. The trial court did not err in admitting the evidence. Although not argued below or on appeal, we note that the web searches were primarily aimed at methods of death that would not be clearly seen by the naked eye on discovery of a body. The fact that Fern died in such a manner adds to the probative value of the evidence.

Brooks, 2008 WL 2897093, at *14–18.

### i. Legal Standard and Analysis

A federal court in a habeas proceeding does not review questions of state evidence law. Estelle, 502 U.S. at 67. Our inquiry is limited to whether the evidence ruling "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). With respect to the admission of evidence, there is no Supreme Court precedent governing a court's discretionary decision to admit evidence as a violation of due process. In Holley v. Yarborough, the Ninth Circuit stated:

> Under AEDPA, even clearly erroneous admissions of evidence that render a trial fundamentally unfair may not permit the grant of federal habeas corpus relief if not forbidden by "clearly established Federal law," as laid out by the Supreme Court. 28 U.S.C. § 2254(d). In cases where the Supreme Court has not adequately addressed a claim, this court cannot use its own precedent to find a state court ruling unreasonable. Musladin, 549 U.S. at 77, 127 S.Ct. 649.

> The Supreme Court has made very few rulings regarding the admission of evidence as a violation of due process. Although the Court has been clear that a writ should be issued when constitutional errors have rendered the trial fundamentally unfair, see Williams, 529 U.S. at 375, 120 S.Ct. 1495, it has not yet made a clear ruling that admission of irrelevant or overtly prejudicial evidence constitutes a due process violation sufficient to warrant issuance of the writ. Absent such "clearly established Federal law," we cannot conclude that the state court's ruling was an "unreasonable application." Musladin, 549 U.S. at 77, 127 S.Ct. 649. Under the strict standards of AEDPA, we are therefore without power to issue the writ . . . .

Holley v. Yarborough, 568 F.3d 1091, 1101 (9th Cir. 2009); see Moses v. Payne, 555 F.3d 742, 760 (9th Cir. 2008) (holding that trial court did not abuse its discretion in excluding expert testimony "[b]ecause the Supreme Court's precedents do not establish a principle for evaluating discretionary decisions to exclude the kind of evidence at issue here").  Since there is no clearly established Supreme Court precedent governing a trial court's discretionary decision to admit evidence as a violation of due process, habeas relief is foreclosed.  Id.  Therefore, Petitioner cannot demonstrate that the state court decision was contrary to, or involved an unreasonable application of, clearly established federal law.  See 28 U.S.C. § 2254(d).

Nevertheless, there can be habeas relief for the admission of prejudicial evidence if the admission was fundamentally unfair and resulted in a denial of due process.  Estelle, 502 U.S. at 72; Pulley v. Harris, 465 U.S. 37, 41 (1984).  However, the failure to comply with state rules of evidence alone is neither a necessary nor a sufficient basis for granting federal habeas relief on due process grounds.  Jammal v. Van de Kamp, 926 F.2d 918, 919-920 (9th Cir. 1991).  Only if there are no permissible inferences that the jury may draw from the evidence can its admission rise to the level of a due process violation.  Id. at 920.

Petitioner has failed to show that no permissible inferences existed that the jury might draw from the challenged evidence.  As the state court noted, the evidence of computer searches and Petitioner's discussion with his daughter on ways to kill people were highly probative and relevant to the question of premeditation and deliberation.  Accordingly, it does not rise to the level of a federal claim and is therefore simply an issue of state law.

g.      Instructions on Corpus Delecti Rule

Petitioner complains that the jury was not instructed on the corpus delecti rule to ensure that they would view out-of-court admissions with caution.  The Fifth DCA rejected this claim on direct review, as follows:

> Defendant contends the trial court erred in failing to give an instruction on the corpus delecti rule and to view his oral admissions with caution. He argues that his conversation with his daughter about how to kill someone, the search terms on his home computer, his statements to first responders, his statements to Fern's daughters, and his statements to police were crucial elements of the prosecution's case and the trial court was thus required to instruct on the corpus delecti rule and give a cautionary instruction concerning his oral admissions.

57

"In every criminal trial, the prosecution must prove the corpus delicti, or the body of the crime itself—i.e., the fact of injury, loss, or harm, and the existence of a criminal agency as its cause. In California, it has traditionally been held, the prosecution cannot satisfy this burden by relying exclusively upon the extrajudicial statements, confessions, or admissions of the defendant." (*People v. Alvarez* (2002) 27 Cal.4th 1161, 1168.)

"We [the California Supreme Court] have said that the independent-proof rule 'essentially precludes conviction based solely on a defendant's out-of-court statements.' [Citations.] In other words, ... the rule requires *corroboration* of the defendant's extrajudicial utterances insofar as they indicate a crime was committed, and forces the People to supply, as part of their *burden of proof* in every criminal prosecution, some evidence of the corpus delicti aside from, or in addition to, such statements. [Citations.] (*People v. Alvarez, supra*, 27 Cal.4th at p. 1178.)

"Error in omitting a corpus delicti instruction is considered harmless, and thus no basis for reversal, if there appears no reasonably probability the jury would have reached a result more favorable to the defendant had the instruction been given. [Citation.]" [¶] Of course, as we have seen, the modicum of necessary independent evidence of the corpus delicti, and thus the jury's duty to find such independent proof, is not great. The independent evidence may be circumstantial, and need only be 'a slight or prima facie showing' permitting an inference of injury, loss, or harm from a criminal agency, after which the defendant's statements may be considered to strengthen the case on all issues. [Citations.] If, as a matter of law, this 'slight or prima facie' showing was made, a rational jury, properly instructed, could not have found otherwise, and the omission of an independent-proof instruction is necessarily harmless." (*People v. Alvarez, supra*, 27 Cal.4th at p. 1181.)

The independent evidence that Fern died from a criminal agency was much more than slight. Dr. Wagner testified that Fern died at the hands of another. She was strangled to death. The defendant was not harmed by any failure to give the corpus delicti instruction.

Next, defendant argues that the trial court erred in failing to instruct the jury it must view his out-of-court oral statements with caution.

First, defendant has not shown how the evidence that he conducted searches on the computer related to killing someone is an admission. Thus this portion of his argument fails.

Next, a cautionary instruction is not required if the statement was tape-recorded and that tape was played for the jury. (*People v. Slaughter* (2002) 27 Cal.4th 1187, 1200.) Thus, his statements to law enforcement at the police station did not require that a cautionary instruction be given.

"When evidence is admitted establishing that the defendant made oral admissions, the trial court ordinarily has a sua sponte duty to instruct the jury that such evidence must be viewed with caution. [Citation.]" (*People v. Slaughter, supra*, 27 Cal.4th at p. 1200.) "To determine prejudice, '[w]e apply the normal standard of review for state law error: whether it is reasonably probable the jury would have reached a result more favorable to defendant had the instruction been given.' [Citation.] Because the cautionary instruction's purpose is "'to help the jury to determine whether the statement attributed to the defendant was in fact made, courts examining the prejudice in failing to give the instruction examine the record

to see if there was any conflict in the evidence about the exact words used, their meaning, or whether the admissions were repeated accurately.""" (*People v. Wilson* (2008) 43 Cal.4th 1, 19.)

In addition to the general area defendant discusses in the initial portion of his argument, defendant lists five separate areas of testimony where the accuracy, context, and meaning of his extrajudicial statements were in question and the instruction to view admissions with caution was applicable. The first area is testimony from the paramedic, Steele, that defendant mentioned that Fern did not want CPR performed.

As Steele was en route to Fern's bedside, defendant mentioned that Fern did not want CPR. Steele asked defendant if Fern had the proper paperwork. Defendant said she had the paperwork, but he did not have it on him. On cross-examination, Steele said defendant was not protesting that Fern get CPR but Steele got the sense that "those were her wishes and that he wanted them respected." Defendant testified that the 911 operator, as well as the emergency medical people, asked about life-saving measures for Fern. When asked if the emergency technicians brought the subject up that morning, defendant replied, "I'm sure they did. I remember that they did, but that part is sort of cloudy."

Defendant testified that Fern had do-not-resuscitate orders and a living will. It was not contradicted that the do-not-resuscitate orders were in fact Fern's true wishes. It was also not disputed that a discussion occurred regarding whether CPR should be administered. Thus, the evidence from Steele was not particularly damaging to defendant. In addition, defendant did not dispute that he said this to Steele and said his memory on that issue was "sort of cloudy." Also, while the evidence could be argued as damaging to defendant, it could also be argued that if defendant had killed Fern and knew she was dead he would have had no reason to tell the paramedics to not resuscitate her; thus it could have been viewed by the jury as evidence that he did not kill her.

The next admission that defendant claims necessitated the cautionary instruction was Fire Captain Jeff McEntire's testimony that when he first made contact with defendant he said it had been several hours since he had talked to Fern and he had been up watching the Olympics. McEntire was asked if defendant said what time he had gone to bed. McEntire answered, "No. If I remember correctly, he kind of insinuated that he hadn't gone to bed." McEntire then explained that defendant said he was awake, watching the Olympics, and several hours later he went in and checked on Fern. He rolled her over and that was the last time he had contact with her. Defendant testified he went to bed at midnight and when he got up about 3 a.m. Fern was dead.

Whether defendant said he was watching the Olympics just prior to discovering that Fern was dead or had gone to bed after watching the Olympics and discovered Fern's body hours later was admitted to show that defendant was lying. Other than the fact that it was a lie, it did not have any significance to the killing itself. Defendant himself admitted that he lied to police officers when he was questioned; thus the fact that defendant may have lied about watching the Olympics was not evidence vital to the prosecution of the case and was merely cumulative to other evidence. In addition, Officer Johnson (the officer who stayed at the home until the body was removed) testified that defendant told him that he woke up around 2:45 to use the restroom and he discovered that Fern was not breathing. Johnson's report reflected this same statement by the defendant. McEntire's testimony regarding the timing of when defendant was watching the Olympics was not clear and certain.

Johnson's certain account bolsters defendant's testimony that he was asleep prior to finding Fern dead. It is highly unlikely the jury's verdict would have been influenced by McEntire's testimony.

The next area of admissions defendant utilizes in his argument relates to Officer Johnson's testimony that defendant asked him several times if the mortuary would come and pick up the body, as well as defendant telling him it was Fern's wish to be cremated. Defendant testified that he had a discussion with Officer Johnson about Fern's remains. He testified he was not sure of the procedure because when he worked in hospice care things were already arranged and they just called the mortuary. The purpose of the cautionary instruction is to determine if the statements were actually made. Because defendant admitted he engaged in this discussion, there was no dispute that the statement had been made.

The next portion of Officer Johnson's testimony that defendant claims resulted in prejudice to him because of the absence of the admissions instruction is that defendant told Johnson that Fern had fallen several times against the dresser. Defendant testified that Fern fell several times. Defendant also testified that he told police officers during his interview that Fern had fallen on the dresser. He admitted that this was a lie. The jury was aware, through defendant's own testimony, that he lied on the day of the murder and told officers that Fern had fallen on the dresser. Thus, there was no dispute that defendant made such a statement; the fact that he may have said it more than once on the same day added little to the evidence. The critical damaging inference from the statement was that he was trying to cover up by stating that Fern hit her head on the dresser. He admitted to doing this. The failure to give a cautionary instruction for this admission did not result in any prejudice to defendant.

Another area of admissions revolves around statements Bobby Scrivner attributed to defendant—including that he told her that Fern apparently died from a heart attack, a discussion involving the will on the morning of Fern's death, and calling Bobby to meet her at the bank. Defendant did not deny any of these conversations and merely had a slightly different interpretation of the conversations. He admitted that he told Bobby that he thought Fern died of a heart attack, he discussed the will with Bobby the morning of Fern's death, and he called Bobby and asked her to meet him at the bank. None of the deviations between Bobby's account of what was said and defendant's account of what was said were significant. Defendant challenges Bobby's testimony that defendant made a choking gesture when he described how Fern got marks on her neck. While such a gesture might be assertive conduct, no authority has been cited, nor do we know of any, that categorizes such conduct as an *oral* admission requiring a cautionary instruction.

The final area singled out by defendant as an area of admissions that were prejudicial to him without the cautionary instruction is testimony from the attorney, Dorothy Meyer, he consulted after Fern died. Defendant claims that Meyer testified that defendant stated he was a joint owner of one of Fern's credit union accounts, while defendant testified he did not tell Meyer that he was a joint holder on one of the credit union accounts. Defendant argues that this was one of the items used by the prosecution in showing that he was a liar or that his conduct showed consciousness of guilt. During the prosecution's argument to the jury, the prosecutor said that the fact that defendant went and saw an attorney is irrelevant and at that time he probably needed some guidance on what he was or was not entitled to. During his argument to the jury, defense counsel said that the prosecution accused defendant of lying to Meyer; defendant has not cited any page in the argument to the jury by the prosecution nor have we found one where the

People accused defendant of lying to Meyer. We also fail to see how either version of the discussion with Meyer could have prejudiced defendant. Thus, any error in failing to give the instruction for this evidence was not prejudicial.

Finally, the jury was fully instructed on judging the credibility of witnesses and how to judge their testimony. (*People v. Dickey* (2005) 35 Cal.4th 884, 906–907.) Error, if any, was not prejudicial.

Brooks, 2008 WL 2897093, at *31–35.

> i.     *Legal Standard*

As previously discussed, any error in the state court's determination of whether state law allowed for an instruction in this case cannot form the basis for federal habeas relief. Estelle, 502 U.S. at 71. "'Failure to give [a jury] instruction which might be proper as a matter of state law,' by itself, does not merit federal habeas relief." Menendez, 422 F.3d at 1029. The Supreme Court has stated instead that a claim that a court violated a petitioner's due process rights by omitting an instruction requires a showing that the error "so infected the entire trial that the resulting conviction violate[d] due process." Kibbe, 431 U.S. at 154. The burden on Petitioner is especially heavy "where ... the alleged error involves the failure to give an instruction." Clark v. Brown, 450 F.3d 898, 904 (9th Cir.2006).

Even if constitutional instructional error has occurred, the federal court must still determine whether Petitioner suffered actual prejudice, that is, whether the error "had substantial and injurious effect or influence in determining the jury's verdict." Brecht, 507 U.S. at 637. A "substantial and injurious effect" means a "reasonable probability" that the jury would have arrived at a different verdict had the instruction been given. Clark, 450 F.3d at 916.

> ii.    *Analysis*

Respondent correctly argues that the claim is unexhausted since Petitioner failed to raise it before the California Supreme Court. Regardless, the claim should be denied since it is without merit. 28 U.S.C. § 2254(b)(2).

The claim concerns only the state court's determination of state law. It is well-settled that federal habeas relief is not available to state prisoners challenging state law. Estelle, 502 U.S. at 67 ("We have stated many times that federal habeas corpus relief does not lie for errors of state law); Langford v. Day, 110 F.3d 1380, 1389 (9th Cir. 1997) ("alleged errors in the application of

61

state law are not cognizable in federal habeas corpus" proceedings). There is no Supreme Court authority which requires a defendant's out of court statements or admissions be viewed with caution, or that the admission of prejudicial evidence be limited or restricted. Holley, 568 F.3d at 1101. As noted by the appellate court, in this case the jury was fully instructed on evaluating a witness' testimony. (Doc. 71-5 at 10-14.) The state court reasonably determined that additional instructions would not have altered the outcome of the case.

### h. CALCRIM No. 356

Petitioner argues that the trial court erred in refusing to instruct the jury with CALCRIM No. 356 that statements taken in violation of Miranda may be used for impeachment purposes only. The state court rejected the claim as follows:

> Relying on argument II above, defendant contends that his statements to police were taken in violation of *Miranda*. As such, he argues that the statements could only be used for impeachment purposes and the trial court erred in not instructing pursuant to Judicial Council of California Criminal Jury Instructions, CALCRIM No. 356 that the statements may only be considered in determining if the defendant is telling the truth.

> As previously set forth, defendant's statement was not obtained in violation of *Miranda*. Defendant has not asserted that statements made after the fingernail incident that would require the instruction were admitted. Thus, this issue fails.

Brooks, 2008 WL 2897093, at *31.

Petitioner fails to demonstrate a violation of his due process rights. As noted above, Petitioner's disagreement with the state court determination that the instruction was not required in this case cannot form the basis for federal habeas relief. Estelle, 502 U.S. at 71. "'Failure to give [a jury] instruction which might be proper as a matter of state law,' by itself, does not merit federal habeas relief." Menendez, 422 F.3d at 1029.

Furthermore, there is no possibility that the omission of the instruction "so infected the entire trial that the resulting conviction violate[d] due process." Kibbe, 431 U.S. at 154. As previously discussed, there was no Miranda violation. Therefore, the instruction was irrelevant. The claim should be rejected.

///

///

**IV. RECOMMENDATION**

Accordingly, the Court RECOMMENDS that the Petition for Writ of Habeas Corpus be DENIED with prejudice on the merits.

This Findings and Recommendation is submitted to the United States District Court Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636 (b)(1)(B) and Rule 304 of the Local Rules of Practice for the United States District Court, Eastern District of California. Within twenty-one days after being served with a copy of this Findings and Recommendation, any party may file written objections with the Court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendation." Replies to the Objections shall be served and filed within ten court days after service of the Objections. The Court will then review the Magistrate Judge's ruling pursuant to 28 U.S.C. § 636 (b)(1)(C). The parties are advised that failure to file objections within the specified time may waive the right to appeal the Order of the District Court. <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).

IT IS SO ORDERED.

Dated:   **August 24, 2017**                     **/s/ Jennifer L. Thurston**
                                           UNITED STATES MAGISTRATE JUDGE